(No. 12420.—Judgment affirmed.)

E. H. Johnson, Trustee, Appellee, *vs.* The Canfield-Swigart Company *et al.* Appellants.

*Opinion filed February 18, 1920—Rehearing denied April 9, 1920.*

1. Evidence—*price actually paid for property is admissible to prove value.* The price actually paid at a *bona fide* sale of property is admissible as tending to prove the value of the property and is sufficient proof of the value in the absence of other testimony.

2. Same—*knowledge or notice need not be proved by direct evidence.* Knowledge or notice need not be proved by direct and positive evidence but may be inferred from facts and circumstances.

3. Corporations—*directors are chargeable with knowledge of transactions at their meetings.* The directors of a corporation are chargeable with knowledge of what transpires in the meetings of the board of directors, and the directors' minute book is evidence against them as to what they did at their meetings.

4. Same—*when sale of stock is fraudulent as to existing and subsequent creditors.* The sale of all the stock of an insolvent corporation, the effect of which is to divide the assets among the selling stockholders, amounts to a fraud upon existing creditors, and where the transactions are secret and the corporation is left as a going concern in the hands of an owner practically without means, with full knowledge of the vendors that such owner will continue in the business, the transaction is fraudulent as to subsequent creditors, although all creditors existing at the time of the transaction have been satisfied before the corporation becomes bankrupt.

5. Same—*when transfers of assets to stockholders are fraudulent.* All transactions by which stockholders unlawfully receive assets of an insolvent corporation are fraudulent as to creditors, whether the assets are received by way of shares wholly or partly as a bonus, by the giving back to the stockholders the assets of the corporation, by paying dividends out of capital or by voluntary conveyances of corporate property.

6. SAME—*when doctrine that corporate property is in trust for creditors is applied.* The doctrine that the property of a corporation is held in trust as to creditors is applied only when the corporation is insolvent or where a transaction injuriously affects the creditors directly.

7. SAME—*when vendors who have sold stock in fraud of creditors are not relieved of liability.* Vendors who have sold all the capital stock of an insolvent corporation, receiving its assets in payment, and have knowingly left it operating under an irresponsible owner, cannot relieve themselves of liability to subsequent creditors, at the suit of the trustee in bankruptcy, merely because they sold their stock for less than they paid for it and because they cannot be put *in statu quo.*

APPEAL from the First Branch Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. MARTIN M. GRIDLEY, Judge, presiding.

HARRY A. BIOSSAT, for appellants.

FRED H. ATWOOD, CHARLES O. LOUCKS, and VERNON R. LOUCKS, for appellee.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Appellee, E. H. Johnson, as trustee in bankruptcy of the estate of the Turnbull-Joice Lumber Company, bankrupt, filed a bill in the superior court of Cook county against the Canfield-Swigart Company, Charles J. Canfield, George W. Swigart, Charles C. Young, John K. Joice and William H. Turnbull, as former officers and stockholders of the Turnbull-Joice Lumber Company, an Illinois corporation, to compel the return of capital and assets of the latter corporation amounting approximately to $50,000, alleged to have been wrongfully and fraudulently withdrawn therefrom by them. Answer was filed and also a replication to the answer. Pending the proceedings Young and Turnbull died and the suit abated as to them. On a reference to him

the master in chancery recommended in his report to the court that a decree be entered against the Canfield-Swigart Company in the sum of $28,049.70 and against Canfield in the sum of $7812.88, with interest on said sums at five per cent from July 8, 1907. Appellants filed objections to the report and exceptions to the master's ruling thereon, which on final hearing were sustained by the court and a decree was entered dismissing the bill for want of equity. On appeal the Appellate Court for the First District reversed the decree and remanded the cause to the superior court, with directions to enter a decree against the Canfield-Swigart Company for $28,049.70 and against Canfield for $7812.88, with interest from December 28, 1911, (the date demand was made and suit was begun,) and granted a certificate of importance and an appeal to this court.

The following facts are well established by the record evidence: The Turnbull-Joice Lumber Company was incorporated in May, 1905, with a capital stock of $50,000, divided into 500 shares of the par value of $100 each. John K. Joice subscribed for 167 shares, William H. Turnbull 100 shares, Charles J. Canfield 80 shares, George W. Swigart 80 shares and Charles C. Young 73 shares. All of them paid cash in full for their stock except Joice, who was practically without means. Canfield advanced the money to pay for Joice's shares, which were issued to Joice and assigned by him in blank and delivered to Canfield as collateral security for the money so advanced. On July 8, 1907, the shares in said corporation were held thus: Young 52 shares, Turnbull 71 shares, Swigart, as trustee for the Canfield-Swigart Company, 259 shares and Joice 118 shares. The certificates of stock for 118 shares to Joice were still held by Canfield as collateral security for said loan, no part of which had been paid by Joice on said date. That stock, until paid for, was to be voted by Canfield as if belonging to him, and the earnings of the stock were to be applied on the payment of the loan and interest, and none of the

stock was to be delivered to Joice until the full amount of principal and interest was paid. The corporation declared a dividend of forty-five per cent on March 2, 1906, and a dividend of ten per cent on November 26, 1906. No part of these dividends was paid to Canfield by Joice on his indebtedness. The forty-five per cent dividend was declared to enable the stockholders to pay for stock subscribed by them in the Ouachita Lumber Company, which was then being organized with a capital stock of $50,000, the entire capital stock of which was subscribed for and held by the same persons who held the stock of the Turnbull-Joice Lumber Company and in the same proportion, practically, and both companies had the same officers and directors. The Canfield-Swigart Company was a West Virginia corporation, organized prior to either of the other corporations, and its capital stock was all owned by Canfield and Swigart in equal shares, and its 259 shares in the Turnbull-Joice Lumber Company were held by Swigart and in his name in trust for the Canfield-Swigart Company. The purpose of the Ouachita Lumber Company was to co-operate with the Turnbull-Joice Lumber Company in the lumber business. It leased a saw-mill at West Monroe, Louisiana, and manufactured and sold lumber, principally yellow pine. The Turnbull-Joice Lumber Company did not manufacture lumber, but sold the larger part of the output of the Ouachita Lumber Company and received a commission therefor of one dollar per thousand.

On July 8, 1907, and for several months prior thereto, the officers of the Turnbull-Joice Lumber Company were: William H. Turnbull president, John K. Joice vice-president, George W. Swigart secretary and Charles J. Canfield treasurer. For several weeks prior to that date, Swigart, on behalf of himself and as the authorized agent of Canfield, Young, Turnbull and the Canfield-Swigart Company, was negotiating with Joice for the sale to him of all the capital stock held by them in the Turnbull-Joice Lumber Company,

including the 118 shares held by Canfield for Joice. During these negotiations, and prior thereto, the parties so represented had access to the trial balances of the company, prepared monthly, and were familiar with the nature, extent and value of its assets and liabilities as stockholders and officers of the company. A statement of such assets and liabilities on June 1, 1907, was made by Joice to the Commercial National Bank with a view of borrowing $30,000 from said bank in the name of the corporation, to make payment on his contemplated purchase of said certificates of stock. This statement showed the assets to amount to $134,746.80 and the liabilities (including capital stock) to amount to $108,860.88, leaving an apparent surplus of $25,885.92. The assets so shown were subject to deductions and allowances on account of demurrage, shortages, freight, etc., on the lumber handled by the company and shipped direct to its customers and for which the customers were to receive credit when their expense bills were forwarded. Joice, as an officer of the company, was authorized by it, at the time this statement was made, to borrow money for it. On his statement to the bank he did borrow in the name of the company $30,000, the loan being completed July 8, 1907. On this day, or prior thereto, Swigart and Joice had agreed on the sale to Joice and on $54,150 as the value of all the certificates of stock of the corporation to be sold to him, including the shares held by Canfield for Joice. The contract also bound Joice to pay two notes that the Turnbull-Joice Lumber Company owed the Canfield-Swigart Company, amounting to $4005.33, and required him to pay to them in cash $53,188.81.

To complete the above deal, on the same day, July 8, 1907, a special meeting of the directors of the company called by the president was held at its office, the minutes of this meeting showing as present Turnbull, Joice, Young, Swigart and Canfield, the officers and stockholders of the company. The following business was transacted in the

·order here given: Turnbull's resignation as president and director was handed in to the secretary of the company, was accepted and M. E. Monehan was elected director to fill that vacancy, receiving the vote of all directors present. Joice then tendered his resignation as vice-president, which was accepted, and he was then elected president of the corporation to fill the vacancy therein, Swigart seconding the motion to make him president, all directors present voting. Joice then took the chair as president and Young presented his resignation as director, which was accepted. On motion, seconded by Swigart, D. C. Hibbott was elected to fill the vacancy caused by the resignation of Young, all directors present voting yea. Canfield thereupon presented his resignation as director, which was accepted, and upon motion, seconded by Swigart, Mark Summers was elected director to fill that vacancy. Canfield then presented his resignation as treasurer, which was followed by the resignation of Swigart as secretary and director, both of which were accepted. C. S. Hinkley was then elected director, Monehan as treasurer and Hibbott as secretary to fill the vacancies made by the resignations of Canfield and Swigart. Thereupon Joice relinquished the chair, putting in Hibbott to preside in his place, and the new officers then elected Joice as general manager and fixed his salary at $16,000 per year, payable in monthly installments. Upon Joice again taking the chair a dividend of one hundred per cent was declared on the capital stock of the corporation, to be paid at once, all directors present and voting yea. The last business of the meeting was a resolution adopted to take over and assume the contract of purchase that day made by Joice with Canfield, trustee, and to complete the payment for the purchase price of certain stock, and that the corporation pay to Joice $7000, the amount paid by him to Canfield, trustee, as part payment on the purchase price of the stock, being $12,500 of the capital stock of the Ouachita Lumber Company. The dividend of one hundred per

cent so declared was for the purpose of paying the cash payment to the stockholders for their certificates, including those held by Canfield as collateral, and for the payment of two notes of the corporation of $2000 each given in August, 1906, to the Canfield-Swigart Company, amounting to $4005.33.

On the same day, July 8, 1907, just after the election of the new officers of the corporation, as aforesaid, Joice procured a loan of $30,000 to the corporation from the Commercial National Bank on the statement as to the assets and liabilities of the company of June 1, 1907, and on notes given to the bank and signed by Joice and the Turnbull-Joice Lumber Company by Mark Summers, vice-president, and deposited said sum with that bank to the credit of the corporation. He then procured a cashier's check of that bank for $27,930.85, payable to the order of the Canfield-Swigart Company out of said deposit, and delivered it to Swigart as a payment on said certificates of stock, and Swigart immediately delivered to him all of said certificates of stock, assigned in blank. This payment left due on the certificates of stock, and on the notes of the Canfield-Swigart Company amounting to $4005.33, the sum of $25,257.96. The Ouachita Lumber Company at that time owed the Turnbull-Joice Lumber Company the same amount of $25,-257.96 for money previously borrowed of the latter company. Joice now owned all the stock of the Turnbull-Joice Lumber Company except two shares, each held by the newly elected directors merely for the purpose of enabling them to be officers of the company. Joice proposed to Swigart that he would assume and pay the debt of the Ouachita Lumber Company to the Turnbull-Joice Lumber Company if Swigart would look to the Ouachita Lumber Company for the sum of $25,257.96. Swigart would not settle the balance that way. The balance was settled by Swigart drawing a check on the Canfield-Swigart Company, payable to the Ouachita Lumber Company, for said amount to enable

that company to pay its debt to the Turnbull-Joice Lumber Company and to enable Joice to pay Swigart the balance due him. The Ouachita Lumber Company then indorsed, by Swigart, its president, this Canfield-Swigart Company check to the Turnbull-Joice Lumber Company in payment of its debt to the latter company and the latter company deposited the check to its credit at the First National Bank. The Ouachita Lumber Company gave its note to the Canfield-Swigart Company for said amount. A check for the same amount was then drawn by the Turnbull-Joice Lumber Company on the First National Bank on said deposit, payable to Joice, and was by him indorsed and delivered to Swigart on July 9, 1907, to complete the payment and settlement for said shares of stock, etc. Swigart then deposited both checks, totaling $53,188.81, with the Canfield-Swigart Company and distributed the money to the original holders of the certificates of stock, which they received as the amounts severally due them, as follows:

| | | | |
|---|---|---|---|
| Turnbull, par value | $7100 | Dividend | $589.30 |
| Young, par value | 5200 | Dividend | 431.60 |
| Canfield-S. Co., par value | 25,900 | Dividend | 2149.70 |
| Canfield, on debt for stock held for Joice | | | 7812.88 |
| Canfield-S. Co., on said notes | | | 4005.33 |

In addition to the par value of their certificates of stock, Turnbull, Young and the Canfield-Swigart Company received a dividend or premium of 8.3 per cent, as above shown. The dividend at the same rate on the 118 shares of stock held by Canfield for Joice would amount to $979.40. Canfield lacked $3987.12 of receiving by the above distribution the par value of said shares on the debt due him by Joice on the shares. Joice afterwards paid him all he owed him on said shares, including interest at six per cent per annum. When the above distribution was made Joice still owed Canfield on said shares and for money Canfield had loaned him to purchase shares in the Ouachita Lumber Company the sum of $11,000. The Ouachita Lumber Com-

pany went out of business before the Turnbull-Joice Lumber Company was declared a bankrupt, was insolvent, and none of its stockholders realized anything out of their holdings in that company. The Turnbull-Joice Lumber Company owed the Canfield-Swigart Company $55,000 on twelve notes given to the latter company, including the two notes included in the settlement. The other ten notes were paid to the Canfield-Swigart Company by the Turnbull-Joice Lumber Company shortly before July 8, 1907, and during the time Joice was negotiating with Swigart for the purchase of said stock, or at least a portion of them was paid in that time. Those that were not paid then, if any, were paid shortly after July 8, 1907.

Joice by his purchase became the sole owner of all the capital stock of the Turnbull-Joice Lumber Company, although a few shares were nominally held by others for the purpose of qualifying them to be officers of the company, and the business of that company was continued under his ownership and control until it was declared bankrupt. The sale was made to him, and to him only, with full knowledge of appellants that he was paying for the stock out of the assets of the company and that its business would continue under his management and control. Up to January 8, 1908, the company carried on its business under his management without any apparent outward change in its organization. It continued to use the same stationery that had been used prior to July 8, 1907, and gave no public notice of the change that had taken place. Canfield, Swigart and Turnbull, by letter of January 8, 1908, requested Joice to cease using the old stationery, and thereafter the names of Canfield, Swigart and Turnbull no longer appeared on the stationery used by the company. The company was insolvent from the time Joice became the owner of all of its stock until it was declared a bankrupt, on April 26, 1910, and Joice was practically without means himself, which facts were known to the old stockholders, and particu-

larly to Canfield and Swigart, or at least they knew these facts existed on the date they sold their certificates of stock. Although it did a business amounting to $20,000 to $60,000 per month, it was only able to continue business as long as it did by continually borrowing money and changing its creditors. Most of the time it paid as high as twenty and twenty-five per cent interest and hypothecated its bills receivable to the Mercantile Credit Company, which made cash advances to it, charging the high rates of interest aforesaid. It was declared a bankrupt by the United States district court and appellee was appointed and qualified as trustee. Claims aggregating $88,413.04 were filed against the estate in bankruptcy, of which $52,709.26 were uncontested. The remainder were being contested as to the amounts due the several claimants when the decree was entered in this case. The assets of the company at the time of the adjudication in bankruptcy amounted in value to $1584.82. None of the claims against the estate were in existence on or prior to July 8, 1907. They began to accrue as to those claimants in January, 1909, but there was no time after July 8, 1907, that it did not owe many thousands of dollars.

The facts above recited are substantially the same as those found by the master in chancery. The effect the transaction in question had upon the financial condition of the corporation will be seen by the following summary: July 8, 1907, $46,012.88 of the capital and $3170.60 of the surplus was actually withdrawn from the company and distributed to Turnbull, Young, Canfield and the Canfield-Swigart Company, leaving only $3987.12 of capital and $979.40 of the surplus of the company undistributed. Canfield afterwards withdrew all the remainder of the capital when he was later paid by Joice the balance due on the shares held by Joice, and also all the balance of the surplus or the dividend of 8.3 per cent on the stock in Canfield's hands held for Joice, as the interest on the $11,800 ad-

vanced or loaned to Joice amounted to more than the dividend on the stock July 8, 1907. Canfield, as trustee, also withdrew $7000 more from the Turnbull-Joice Lumber Company for the $12,500 capital stock in the Ouachita Lumber Company, which proved to be worthless. The Canfield-Swigart Company not only withdrew all the capital and surplus represented by its stock in the Turnbull-Joice Lumber Company, but was paid in full the entire sum of $55,000 owed to it by the Turnbull-Joice Lumber Company. Of that debt $4000 and interest was paid July 8, 1907. The record positively shows that $12,000 of the $55,000 debt was paid in the same year before July 8, 1907, pending the negotiations for the sale of the stock to Joice. The record does not show when the remaining $39,000 of this debt was paid by the Turnbull-Joice Lumber Company,—whether before or after July 8, 1907,—owing to a very bad memory of Swigart, Canfield and Turnbull, and to the further fact that the books of the Turnbull-Joice Lumber Company, which in all probability would have shown these matters, were burned up in Joice's house "by someone that was in his house," as testified to by Joice.

The argument of appellants that appellee failed to prove that the capital and surplus of the Turnbull-Joice Lumber Company were withdrawn, as aforesaid, by Turnbull, Young, Canfield and the Canfield-Swigart Company and that the company was left totally insolvent, in view of the evidence is absolutely untenable. It was not possible, for the reasons aforesaid, for appellee to prove the exact value of the assets by the records of the company and its former officers and stockholders. He did prove that after months of deliberation appellants were willing to and did sell the entire stock of the corporation held by them for $54,150. Appellants insist, and Canfield, Swigart and Joice so testified, that the sale was *bona fide.* The price actually paid at a *bona fide* sale of property, the value of which is in issue, is admissible to prove the value of such

property. (13 Ency. of Evidence, 447, 528, 539.) Such proof is sufficient evidence of its value in the absence of other testimony. (13 Ency. of Evidence, 536.) There is a strong presumption that in such sale, if made in good faith, the appellants would not deliberately part with their holdings for many thousands of dollars less than their actual value. The positive testimony in this record that the net assets of the corporation were worth much more than said sum does not overcome that presumption and the other evidence in the record. If the sale was fraudulent as to creditors, appellants would not be aided in this suit by a claim and showing that they received some less than the actual value of their stock.

We do not deem it necessary or advisable to discuss at length the force of the various proofs found in the record and from which we make the finding that appellants are chargeable with notice of the facts above recited, further than to state that Swigart was chargeable with notice of the things that he authorized Joice to do by the use of his stock in voting at the special meeting. The evidence shows that the minutes of that meeting were written up by three o'clock on that day, and that Swigart held the certificates of stock of all the parties until after the conclusion of that meeting and until after Joice had borrowed the $30,000 from the Commercial National Bank, as the notes given for that $30,000 by the corporation clearly show, being signed by the vice-president elected at that meeting. It was Swigart's duty to find out what Joice had done in his name, as an officer and stockholder of the company, at that special meeting. He must be held to have authorized as well as empowered Joice to do in his name, as an officer and stockholder, what Joice actually did do in his name at that meeting. Directors of a corporation are chargeable with knowledge of what transpires in the meetings of the board of directors, and the directors' minute book is evidence against them as to what they did at those meetings. (Cook

on Corp.—6th ed.—727.) Knowledge or notice need not necessarily be proved by direct and positive evidence but may be inferred from facts and circumstances. (8 Ency. of Evidence, 18.)

There is much evidence in the record, although circumstantial, tending to show that the sale was fraudulent as to creditors, and that the same was carried out and the affairs of the corporation carried on after the sale with intent to defeat creditors, or with knowledge that the transaction would have that effect against creditors and that loss would fall upon future creditors. Appellants positively knew that Joice had very little means of his own, or they should have known it. Bruckner, vice-president of the Commercial National Bank, in testifying as to Joice's financial condition, said, "He didn't have much." Joice did not have the money to pay for his stock in the corporation or the stock that he held in the Ouachita Lumber Company. The statement that Joice filed with the bank June 1, 1907, shows that he owed the Turnbull-Joice Lumber Company over $1400. There is no other evidence in this record contradicting the fact that he was a man of very little means and that Swigart and Canfield well knew it. They sold the entire stock to him, and to him only, knowing that he intended to continue the corporation in business and that he and it were without means to finance the corporation and that he must necessarily contract debts to continue the business. The conveyance was kept secret, and the business of the company was transacted apparently as before the transaction, and for some time after, by the use of the same stationery. The deal was conducted in a way to cover up and conceal the actual transaction between the parties,—that is, the actual fact that appellants were to be paid out of the assets of the company. Swigart, the representative of the other vendors, actually knew that the check for $25,257.96 was to be paid by an asset of the company,—the debt owed to it by the Ouachita Lumber Company,—and the evidence so shows,

yet for the apparent purpose of covering up this fact, the round-about way of this payment, being accomplished as above stated, was resorted to instead of the direct method of having the Turnbull-Joice Lumber Company assign its note of the Ouachita Lumber Company direct to Swigart. The same character of transaction was resorted to in the payment of the large check of $27,930.85, apparently for the purpose of having it appear that it was not paid by a check of the Turnbull-Joice Lumber Company to Swigart, which would have been the direct and usual method. The proceedings in the special meeting of the stockholders of the corporation that was called by Turnbull, its president, is further evidence of appellants' knowledge that Joice could only pay them, and would pay them, out of the assets of the company for the stock sold. It is true that both Swigart and Canfield testified that they were not at that meeting except for a short while in the morning, but it appears from the testimony of Swigart himself, the representative of all the vendors, that he authorized Joice to use his name and the stock held by him in seconding and voting on motions. It finally appears that during the time Joice was owner of all the stock of the corporation and conducting its business he was able to so shift the creditors of the corporation that no one who was a creditor previous to January 1, 1909, was a creditor when the company was declared a bankrupt. All the creditors filing claims against the estate in bankruptcy became creditors after January 1, 1909. Most all of them were non-residents of this State, the non-residents being generally lumber companies and banks. More than $30,000 of this indebtedness was owed to eight banks, five of which were not banks of Illinois but were banks doing business in other States, one each in New York, Michigan, Wisconsin, Louisiana and Mississippi. The other three banks do not appear to be banks of Chicago but their place of business is not given. These facts tend to evidence fear in the parties to the transaction

and cautious action to avoid the danger of creditors attacking, from the time the deal was begun and finished and up to the time of bankruptcy of the corporation, and tend also to establish that the whole transaction, from beginning to end, was a scheme, and a very artful one, planned and executed with much skill and for the purpose of avoiding existing creditors' attacks.

The transactions of appellants and their associates with Joice as a purchaser, of which appellee is here complaining, amounted to a sale of all the capital and assets of the corporation and a division thereof among the stockholders after the payment of all debts due the stockholders from the corporation and without payment of the other debts owed by it. The sale of all the stock of the corporation was in legal effect a sale of all of its assets. (*Benedict* v. *Dakin,* 243 Ill. 384.) This amounted to a fraud upon the then existing creditors, as the corporation was then insolvent and left as a going concern in the hands of an owner practically without means and with full knowledge of appellants that such owner would continue the business of the corporation. The fact that it was to continue as a going concern under such management, without sufficient means to replace the lost capital and assets even to the point of solvency, made it reasonably certain that Joice would be compelled to borrow money or become indebted in the name of the corporation for means to continue the business and that loss would likely fall upon future creditors. As the transactions were all secret and the corporation continued as a going concern, apparently without change in any way and without notice to the subsequent creditors, they were fraudulent as to such creditors so deceived. Under such circumstances many of the authorities hold that the true ground of recovery to an assignee in bankruptcy for the benefit of such subsequent creditors is fraud, even where there is no statute expressly making such a conveyance unlawful. Most all of the courts of last resort in this coun-

try uniformly hold that such conveyances are fraudulent as to existing and subsequent creditors when there is an existing statute in their jurisdiction declaring such a conveyance illegal. Our statute prohibits the payment of any dividend when a corporation is insolvent or when such payment would diminish the amount of its capital stock. (Hurd's Stat. 1917, chap. 32, sec. 19; *Coquard* v. *National Linseed Oil Co.* 171 Ill. 480.) This doctrine of fraud is applicable and is applied by the courts to all cases in which stockholders receive assets of their corporation to which they are not entitled, whether the same be by way of receiving shares wholly or partly as a bonus, by the giving back to them of the assets of the corporation, by paying to them dividends out of capital or by voluntary conveyances of corporate property to them, as all of such forms of conveyance amount to one and the same thing and reach the same results.

*Mackall* v. *Pocock,* 136 Minn. 8, is an authority holding that stockholders receiving dividends out of the capital of a corporation at a time when it had made no profits, owed debts but was not then insolvent, are liable to the trustee in bankruptcy for the benefit of creditors who became such after the payment of such dividends, the corporation having become a bankrupt, and such holding is not placed on the ground of any statutory provision. It is based on the doctrine laid down in *Hospes* v. *Northwestern Manf. and Car Co.* 48 Minn. 174, in which latter case it is said: "The capital of a corporation is the basis of its credit. It is a substitute for the individual liability of those who own its stock. People deal with it and give it credit on the faith of it. They have a right to assume that it has paid-in capital to the amount which it represents itself as having, and if they give it credit on the faith of that representation and if the representation is false it is a fraud upon them, and in case the corporation becomes insolvent, the law, upon the plainest principles of common justice, says to the delin-

quent stockholder, 'Make that representation good by paying for your stock.' "

In *In re Haas Co.* 131 Fed. 232, the sole question was whether or not it is within the lawful power of shareholders of a corporation, to the exclusion of subsequent creditors of the corporation, to use the notes and pledge the assets of the corporation toward paying the shareholders' individual debts contracted in the purchase from others of such shares. In a decision in favor of the trustee in bankruptcy Judge Grosscup said: "Dividends mean a division of earnings,—not of capital and assets as such,—and a final division of capital and assets means that the corporation will invite no further credit. Under the name of dividends there can be no lawful division of assets and capital that would impair the rights of creditors, and so long as the corporation is a going concern there can be no lawful division of capital and assets that would diminish the security upon which continuing or future credit will be presumably based.   *   *   *   Unless shareholders may invade at will the capital and assets of the corporation, appropriating them with impunity to the payment of their individual debts, the transaction complained of by the trustee cannot be sustained." *Coleman* v. *Tepel,* 230 Fed. 63, is a like authority holding that actual intent to defraud is not essential, and that the stockholder is bound when the direct object or immediate consequence is the insolvency of the corporation and injury to creditors,—subsequent creditors.

In *Atlanta and Walworth Butter and Cheese Ass'n* v. *Smith,* 141 Wis. 377, the facts were that a greater portion of the assets of the corporation were exchanged for stock with knowledge that the corporation was to continue in business. The court said: "A transaction, as in this case, where by treaty the corporation is at once changed from a solvent to an insolvent concern to the manifest advantage of a stockholder over existing creditors, the parties concerned contemplating that it may, and probably will, incur

other indebtedness, while having the semblance of solvency as before, should be regarded, as to all creditors prejudiced thereby, characterized by bad faith and so as not having the essential necessary to uphold it under the decisions of this court to which we have referred. In other words, a purchase by a corporation of its own stock known by the parties to the transaction, or which ought to be known by them, to render it insolvent, is not a purchase in good faith as to existing creditors, and not such as to future creditors if the parties to the transaction contemplate that the corporation will continue to do business and incur indebtedness, as before, on the faith of its previously supposed solvency continuing. In such a case a stockholder surrendering his stock is to be regarded as having acted fraudulently,—at least constructively,—as to existing creditors and subsequent creditors as well, and held, as to the latter, estopped by his conduct from denying his continuance as a stockholder, so far as such denial, in effect, would prejudice such creditors trusting the corporation upon the appearance of solvency, and such continuance is necessary to liability to the corporation for the benefit of creditors or to statutory liability to them." It is recognized in that case that as to future creditors the usual rule is that the fraud must be an actual intent to defraud. It is stated, however, that where there is a statute prohibiting such act the modern general rule is as above stated, citing Moore on Fraudulent Conveyances, 191, and Bump on Fraudulent Conveyances, sec. 292. This seems to be now the well established rule in this country in all jurisdictions where the question has been adjudicated. *Clark* v. *Clark Machine Co.* 151 Mich. 416; *American Steel and Wire Co.* v. *Eddy,* 130 id. 266; *Cottrell* v. *Albany Card and Paper Manf. Co.* 126 N. Y. Supp. 1070; *Hall* v. *Henderson,* 126 Ala. 449; *Kom* v. *Cody Detective Agency,* 76 Wash. 540; *Brenaman* v. *Whitehouse,* 85 id. 355; *Crandall* v. *Lincoln,* (Conn.) 52 Am. Rep. 560; *Maryland Trust Co.* v. *National Mechanics' Bank,* 102 Md. 608; *Lefker* v.

*Harner,* 123 Ark. 575; *Williams* v. *Boice,* 38 N. J. Eq. 364; 2 Cook on Corp. (5th ed.) sec. 548; Morawetz on Corp. 786, 824, 827.

The question has not heretofore been passed on in this State. Questions between stockholders and corporations have usually been considered under the doctrine that the property of a corporation is property held in trust as to creditors. This doctrine does not apply except when the corporation is insolvent or where the transaction injuriously affects creditors directly. (*Clapp* v. *Peterson,* 104 Ill. 26.) It has been said by good authority that the trust theory, in name, has largely been abandoned and that the rights of creditors are more recently worked out upon the doctrine of fraud. (4 Thompson on Corp.—2d ed.—secs. 3421, 3422.) We think it is more accurate to say that both doctrines are still recognized in those States where the trust doctrine has been enforced, and that each one of them is applicable only in the cases where the respective doctrines properly apply to the particular facts to be considered. The facts in the case now under consideration undoubtedly make a very strong case of fraud that can be taken advantage of by both existing and subsequent creditors. No case that we have examined makes out a case of fraud so completely as to subsequent creditors, and their rights cannot be evaded upon the ground that all creditors existing at the time of the transaction have been satisfied. This is particularly so because the subsequent creditors, in our judgment, have only taken the place of the former creditors and have with their money and property paid off the debts of the former. The allegations of the bill of complaint of appellee are sufficient to maintain his suit, as shown by a number of authorities already cited, and the evidence clearly supports the same by the greater weight of evidence.

Appellants have complained that the court erroneously admitted in evidence against them the statement of July 1, 1907, made by Joice to the First National Bank to obtain

the loan of $30,000. This evidence was competent in rebuttal of Joice's testimony showing thousands of dollars of assets over the liabilities of the corporation more than the statement shows, the statement and his evidence covering about the same time. It is altogether immaterial whether it be considered at all or not upon the question of the value of the assets of the corporation July 8, 1907, as such value was amply proved by the other evidence, as already indicated. Swigart's testimony in the bankruptcy court was admitted in this case by agreement, and it cannot now be complained of by the appellants as improper or for any other reason.

There is no merit in the contention of appellants that equity can grant no relief in this case except by placing the appellants *in statu quo*. It amounts to little more than the whole defense over again: that they surrendered very valuable stock for less than it was worth, and that appellee cannot recover unless the court can undo all that they and Joice did on the day of the transaction and what Joice has done since that day, and return to them their stock as valuable as it was when they delivered it to Joice,—all of which is impossible. By their secret and illegal transactions they have deceived and damaged the creditors who thereafter dealt with the corporation, and by every principle of justice and equity they should be held liable to appellee, for the use of such creditors, to the amount of the capital of the corporation so illegally withdrawn by them; and the fact that Joice was not also held liable does not change or mitigate their liability, as the ruling of the court in that regard is not otherwise questioned on this appeal.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*