# RECONSTRUCTION FINANCE CORPORA-
## TION v. TETER et al.
### No. 7282.

Circuit Court of Appeals, Seventh Circuit.

Jan. 4, 1941.

Rehearing Denied Feb. 26, 1941.

718

Lee Walker, M. O. Hoel, Lewis D. Wilson, and Richard E. Steinbrecher, all of Chicago, Ill., for appellant.

Leland K. Neeves, W. T. Durbin, Samuel T. Lawton, Don K. Jones, Vincent O'Brien, and Tracy Buckingham, all of Chicago, Ill., for appellees.

Before SPARKS, MAJOR, and TREANOR, Circuit Judges.

SPARKS, Circuit Judge.

This equitable action was brought against the C. T. C. Investment Company and its stockholders to recover upon two guaranties executed by that company, and to recover upon two agreements executed by certain of the individual defendants who were stockholders of that company. The action was brought against the last-named defendants, both as individuals and as stockholders. Motions to dismiss the complaint, and to quash the summons and the return thereof against the C. T. C. Investment Company were sustained. The appeal is from the decree quashing the summons against the C. T. C. Investment Company and dismissing the complaint.

The only facts before the court were those appearing in the amended complaint, which substantially are as follows: In May, 1929, The National Bank of the Republic of Chicago, and the Chicago Trust Company decided to combine. The plan provided that out of the combination there should emerge a new bank to be known as National Bank of the Republic of Chicago, and a new trust company to be known as Chicago Trust Company.

The New Republic Bank was to acquire the commercial business of both the old bank and the old trust company, and the New Chicago Trust Company was to acquire certain of the other business of the old bank and the old trust company. The stock of the

New Republic Bank was to be distributed pro rata to the stockholders of the old bank and the old trust company, and the stock of the New Chicago Trust Company was to be issued to trustees to be held for the benefit of the stockholders of the New Republic Bank. The assets of the old trust company and the old bank not required for the combination were to be transferred by them for the benefit of their respective shareholders upon whatever terms and conditions they should deem proper. Included among the surplus assets of the old trust company to be so transferred were the common stock and surplus assets of its investment affiliate, the C. T. C. Securities Company.

It was further provided that the assets to be contributed respectively by the old trust company and the old bank were to be passed upon and approved by a committee to be selected from the personnel of each of those banks. If there should be any deficiency in the assets to be contributed to the combination, the amount thereof was to be paid in cash by the respective stockholders of the two banks.

Pursuant to the plan, the old trust company caused to be organized the C. T. C. Investment Company, an Illinois corporation, to take and hold for the benefit of the stockholders of the old trust company such of its assets as were not needed for the consolidation. Among these assets was the common stock of the C. T. C. Securities Company. The stock of the C. T. C. Investment Company was distributed to or for the benefit of the shareholders of the old trust company.

Neither the old bank nor the old trust company had sufficient assets acceptable to the committee, and an agreement was entered into providing that the unacceptable assets should be taken out of the new bank by July 10, 1929, and that the excess funds of each bank not necessary to complete the consolidation, and the assets of the C. T. C. Investment Company, should be treated as trust funds for the purpose of making good to the new bank the unacceptable assets to be taken out. It was further agreed that certain of the unacceptable items might be guaranteed by C. T. C. Investment Company instead of being taken out of the new bank.

To induce the new bank to accept undesirable assets contributed by the old trust company, the C. T. C. Investment Company executed its guaranty, under seal, known as Exhibit (5) dated June 29, 1929,[1] by which

---

[1] "Whereas, Chicago Trust Company, * * * and The National Bank of the Republic of Chicago, * * * have entered into a Plan of Reorganization and Consolidation (hereinafter referred to as 'Plan'), effective July 1, 1929, and the said Chicago Trust Company, as a part of said Plan, has transferred its excess assets to C. T. C. Investment Company, * * * subject to the guaranty by said C. T. C. Investment Company of certain assets, hereinafter referred to, which have been contributed by Chicago Trust Company to the consummation of said Plan; and

"Whereas, certain of the loans and discounts of said Chicago Trust Company, constituting its contribution of assets to the capital, surplus and undivided profits of The National Bank of the Republic of Chicago (as reorganized and consolidated under said Plan) have been found and determined to be 'Undesirable Assets' under the proposition of Messrs. Otte and McCreight, dated June 29, 1929, and under the terms of said proposition of Messrs. Otte and McCreight, dated June 29, 1929, it has been mutually agreed that certain of said loans and discounts of said Chicago Trust Company found to be undesirable assets be guaranteed by said C. T. C. Investment Company instead of being taken out of The Bank, * * * which said certain assets to be guaranteed are included and listed in the schedule hereto attached, entitled 'Schedule of Undesirable Assets Guaranteed by C. T. C. Investment Company' and marked Exhibit 'A', * * *

"Now, Therefore, in consideration of the premises and the further consideration of One Dollar * * * said C. T. C. Investment Company does hereby guarantee payment of all of said loans, discounts and/or obligations set forth in the aforesaid attached Schedule 'A' to said * * * Bank on or before six months from the date hereof, together with interest at the rate specified thereon; hereby waiving demand, notice of nonpayment, protest and notice of protest thereof. Said * * * Bank * * * may make changes in and extensions of the date and terms of payment of any of said obligations, or any part or parts thereof, unless the C. T. C. Investment Company shall give written instructions otherwise.

"It is understood and agreed that the C. T. C. Investment Company may be released from the obligations of this guaranty as to any item herein included, by furnishing endorsements, guarantees and/or collateral applicable thereto, satisfactory to said * * * Bank * * *.

it guaranteed to the new bank, its successors and assigns, the payment of the loans, discounts and obligations set forth in schedule A attached to that guaranty.

Prior to the completion of the combination, there was disclosed an apparent liability of the old trust company and the C. T. C. Securities Company on an underwriting agreement to purchase $900,000 first mortgage bonds of the Union Light & Power Company of Cuba, which bonds were pledged to secure an $800,000 note of the Associated Light & Power Corporation, the owner of the capital stock of the Cuban Company. This note was owned by the First Union Trust & Savings Bank, and was further secured by an agreement of the old trust company that it would find a purchaser for said note by July 24, 1929, or pay the face amount thereof. Pursuant to the demand of the old bank, and to induce it to consummate the combination, Charles H. Requa and certain of the individual defendants executed an agreement, under seal, dated June 29, 1929, hereinafter referred to as exhibit 7,[2] by which they agreed to in-

"This guaranty shall be binding upon the said C. T. C. Investment Company, its successors and assigns, and shall inure to the benefit of said * * * Bank * * *, its successors and assigns.

"In Witness Whereof, said C. T. C. Investment Company has caused its corporate name to be hereunto subscribed and its corporate seal affixed by its duly authorized officers in this behalf, this 29th day of June, A. D. 1929.

"C. T. C. Investment Company,
　　　　　"Joseph A. Duner,
　　　　　　　　"Vice President.

"Attest:
"W. Anderson,
"(Seal)　　Secretary."

[2] "This Memorandum entered into this 29th day of June, A. D. 1929, between the undersigned, Directors and Stockholders of Chicago Trust Company, * * * (hereinafter sometimes called 'First Parties'), * * * and C. T. C. Investment Company, * * * (hereinafter sometimes called 'Investment Company'), party of the second part, Witnesseth the following:

"Chicago Trust Company and The National Bank of the Republic of Chicago have entered into a plan of reorganization and consolidation (hereinafter called 'Plan'), from which will result The National Bank of the Republic of Chicago, Chicago Trust Company and The National Republic Company, effective July 1, 1929.

"Present Chicago Trust Company has underwritten an offer of First Mortgage Bonds of Union Light & Power Company of Cuba in the face amount of $900,000, or part thereof; in connection with such bond issue, Associated Light & Power Corporation, which owns the capital stock of Union Light & Power Company of Cuba, has borrowed from First Trust & Savings Bank (now First Union Trust & Savings Bank), Chicago, Illinois, the sum of $800,000, due July 24, 1929, and has agreed to use the proceeds of said bond issue to pay said note.

"Under date April 24, 1929, Lucius Teter undertook with said First Trust & Savings Bank to purchase or find a purchaser for said note of $800,000, and in the event that the purchaser did not pay said note, agreed to pay the face amount thereof and interest thereon. The agreement of Lucius Teter, though ostensibly personal, was the agreement of Chicago Trust Company as indicated by approval by the Executive Committee of Chicago Trust Company of his action in that behalf. It, however, is not intended that the two banks and The National Republic Company resulting from the Plan, as aforesaid, should have any obligation or liability on Mr. Teter's agreement.

"The assets of Chicago Trust Company, in excess of the amount it is to contribute to the reorganization and consolidation under said Plan (including the Common Capital Stock of C. T. C. Securities Company and the said agreement of underwriting of the First Mortgage Bonds of Union Light & Power Company of Cuba) have been turned over to Investment Company.

"In consideration of the premises and of their several undertakings hereunder, First Parties severally agree to indemnify and hold harmless Lucius Teter and/or the two banks and said Company resulting from such reorganization and consolidation under the Plan aforesaid,—namely The National Bank of the Republic of Chicago, Chicago Trust Company and The National Republic Company—and each of them and their respective successors, from and against any and all damages, costs, expenses, attorneys' fees and/or liabilities of every kind and character whatsoever, for or on account of the liability of Chicago Trust Company in connection with said undertaking, to purchase and/or pay said $800,000 note and interest thereon, and/or its agreement to

demnify and hold harmless the new bank and the new trust company and their successors from and against any and all liabilities of every kind and character on account of the liability of the old trust company in connection with the undertaking to purchase or pay the $800,000 note, and its agreement to underwrite the first mortgage bond issue of the Cuban Company.

On or about August 23, 1929, the C. T. C. Securities Company, without the knowledge or consent of the new bank, purchased the $800,000 note from the First Union Trust & Savings Bank. Upon learning of this fact, the new bank notified appellee Teter that it considered the purchase by the Securities Company a breach of the agreements of combination, consolidation and guaranty, be-

cause it reduced the value of the assets standing behind the guaranties of C. T. C. Investment Company, and it thereupon demanded of the stockholders and directors of the old trust company who had signed the guaranty of June 29, 1929, a further agreement protecting the new bank against loss which might be occasioned by the purchase by the Securities Company of the securities and obligations of the Associated Light and Power Corporation.

Pursuant to such demand, and to induce the new bank to waive any breach of the agreements referred to, Charles H. Requa, and certain of the individual defendants, executed a further agreement, under seal, dated October 10, 1929, which is known as exhibit 8,[3] by which the signers agreed to

---

underwrite said First Mortgage Bond issue of Union Light & Power Company of Cuba.

"It is, however, understood that the liability of First Parties hereunder shall be in proportion to the amounts respectively below set against their names, and that the contribution of each of First Parties shall not in any event be in excess of 105% of the amount below set against his respective name.

"In consideration of the premises, Investment Company hereby agrees at all times and from time to time to indemnify and save harmless, each and every the parties of the first part and their legal representatives, from and against any loss, liability, obligation, damage, cost, expense and/or attorneys' fees which they or any of them may incur or suffer by reason of or in connection with their undertakings hereunder.

"Investment Company agrees that the proceeds, profits and/or income from, upon, in connection with or resulting from the underwriting, purchase and/or sale of the First Mortgage Bonds of Union Light & Power Company of Cuba, under the underwriting agreement aforesaid, or otherwise, are hereby and shall be pledged and allocated for the protection of First Parties on their liabilities hereunder.

"Investment Company agrees further that all other of its assets are hereby pledged and allocated to the protection of the First Parties on their liabilities hereunder, subject, however, to the liability and obligation of Investment Company to make good loans and discounts of Chicago Trust Company, which may be found 'undesirable assets' under the proposition of Messrs. Otte and McCreight, dated June 29, 1929.

"The undertakings of the parties here-

under shall inure to the benefit of and be binding upon the respective successors and legal representatives of the parties hereto.

"In Witness Whereof, the parties hereto have executed this Memorandum the day and year first above appearing.

| | |
|---|---|
| Henry H. Hilton | 80,000.00 |
| by Lucius Teter. | |
| Lucius Teter | $190,000.00 |
| J. W. O'Leary | $160,000.00 |
| Charles H. Requa | $ 90,000.00 |
| Samuel M. Hastings | $ 30,000.00 |
| John A. McCormick | $ 40,000.00 |
| Fletcher M. Durbin | $ 25,000.00 |
| Angus S. Hibbard | $ 15,000.00 |
| C. M. Moderwell | $ 60,000.00" |

[3] "Know All Men by These Presents that in consideration of the sum of One Dollar * * *, the undersigned do hereby severally undertake to indemnify, protect and hold harmless C. T. C. Securities Company and C. T. C. Investment Company against any loss of any nature that may be incurred in connection with any present or future purchases of any of the securities of or any loans to Associated Power and Light Corporation, Union Power and Light Company of Cuba or any committee or corporation in any way allied or affiliated to either of said corporations.

"It is a condition to the liability of the undersigned hereunder (1) that the liability of each of the undersigned shall be limited not to exceed 105% of the amount respectively set against his name below, and further (2) that the aggregate liability hereunder shall in all events be limited not to exceed an amount equivalent to the amount, if any, by which C. T. C. Investment Company fails fully to respond under its Memorandum of Guaranty bearing date June 29, 1929, in relation to certain questioned loans and discounts

indemnify, protect and hold harmless the Securities Company and the C. T. C. Investment Company against loss of any nature that might be incurred in connection with any present or future purchases of any of the securities of, or any loans to, Associated Power & Light Corporation, Union Power and Light Company of Cuba, or any committee or corporation, in any way affiliated with either of those corporations. The aggregate liability thereunder was limited to the amount, if any, by which the Investment Company should fail to respond under its memorandum of guaranty dated June 29, 1929, in relation to certain questioned loans and discounts contributed by the Old Trust Company to the consolidation, a list of which was attached to the memorandum of guaranty.

In October, 1929, the C. T. C. Investment Company executed, under seal, a further guaranty, known as Exhibit 6,[4] by which it guaranteed to the new bank, its successors and assigns, the payment of any additional loans and advances made by that bank at the instance of the C. T. C. Investment Company to the borrowers described in schedule A, and the payment of new loans and advances made at the instance of the C. T. C. Investment Company by the new bank, the proceeds of which were to be used to pay off any of the loans or discounts covered by the previous guaranty.

---

(a list of which is attached to said Memorandum of Guaranty) contributed by Chicago Trust Company to the consolidation and reorganization of The National Bank of the Republic of Chicago and Chicago Trust Company effective July 1, 1929.

"In Witness Whereof, the undersigned have hereunto placed their hands and seals this 10" day of Oct., A. D. 1929.

| Name | Amount |
| --- | --- |
| Lucius Teter | $190,000. |
| J. W. O'Leary | 160,000. |
| Charles H. Requa | 90,000. |
| Geo. T. Buckingham | 80,000. |
| Henry H. Hilton | 80,000. |
| C. M. Moderwell | 60,000. |
| John A. McCormick | 40,000. |
| Samuel M. Hastings | 30,000. |
| Fletcher M. Durbin | 25,000. |
| Angus S. Hibbard | 15,000. |
| J. W. Marshall | 15,000. |
| C. H. Fox | 15,000." |

[4] "Guarantee of increases in guaranteed loans and new loans made to retire guaranteed loans.

"Whereas Chicago Trust Company and The National Bank of the Republic of Chicago have entered into a Plan of Reorganization * * *, effective July 1, 1929 and Chicago Trust Company, as a part of said Plan will transfer its excess assets to C. T. C. Investment Company, subject to guaranty by said C. T. C. Investment Company of certain assets to be contributed by Chicago Trust Company to the consummation of said Plan; and

"Whereas, the said C. T. C. Investment Company did, on this twenty-ninth day of June, A. D. 1929, execute and deliver to said The National Bank of the Republic of Chicago, as reorganized and consolidated under said Plan, a certain instrument of guaranty covering certain loans and discounts of said Chicago Trust Company, itemized and described in a certain Exhibit 'A' attached to said guaranty and made a part thereof, found and determined to be 'undesirable assets' under the proposition of Messrs. Otte and McCreight dated June 29, 1929, as a result of which guaranty said 'undesirable assets' were permitted to remain as a part of the assets of said consolidated bank; and

"Whereas it may become necessary from time to time to increase the amount of certain or all of said loans and discounts guaranteed as aforesaid through the loan or advancement of additional funds by the said The National Bank of the Republic * * *, to the borrowers named in said Exhibit 'A' attached to said guaranty;

"Now, Therefore, in consideration of the premises and the further consideration of One Dollar * * *, said C. T. C. Investment Company does hereby guarantee payment on or before six months from the date hereof of any additional loans and/or advances together with interest at the rate specified therein, made (at the instance of said C. T. C. Investment Company) by the said * * Bank * * *, the proceeds of which are used to pay off to said consolidated bank any one or more of the loans or discounts covered by said guaranty of said C. T. C. Investment Company dated June 29, 1929 as aforesaid, hereby waiving demand, notice of non-payment, protest and notice of protest thereof.

"This guaranty shall be binding upon the said C. T. C. Investment Company, its successors and assigns, and shall inure to the benefit of said The National Bank of the Republic of Chicago, its successors and assigns."

The agreements of guaranty and indemnity, which were attached to the amended complaint, as exhibits 5, 6, 7 and 8, were accepted, and the combination was consummated. The new bank took no action to enforce any liabilities accruing by virtue of the purchase of the $800,000 note by the Securities Company. On July 25, 1931, the new bank assigned and sold to the new trust company all of its assets of every kind. Among these were the loans and discounts listed in schedule A of the guaranty of June 29, 1929, which had not theretofore been paid. There were also included loans and advances made by the new bank at the instance of the C. T. C. Investment Company, pursuant to the terms of the second guaranty, referred to as Exhibit 6, and all rights of the New Republic Bank under the agreements, referred to as exhibits 5, 6, 7 and 8.

On July 25, 1931, the New Chicago Trust Company and the Central Trust Company of Illinois consolidated to form the Central Republic Bank and Trust Company, which thereby became vested with all of the rights and assets of the New Chicago Trust Company, including the loans and discounts, and the new loans and advances guaranteed by the C. T. C. Investment Company, and the rights of the New Chicago Trust Company under the agreements referred to as exhibits 5, 6, 7 and 8.

The Central Republic Bank and Trust Company thereafter became indebted to plaintiff, and there still remains due and owing not less than $43,000,000 on that debt. To secure this indebtedness it pledged to plaintiff, among other collateral, the promissory notes and judgments listed in paragraph 28 of the amended complaint. Each of the notes listed in that paragraph is a loan or discount originally listed and described in schedule A of the guaranty referred to in exhibit 5 of the complaint, or is a new loan or advance made at the instance of the C. T. C. Investment Company, the proceeds of which were used to pay to the New Republic Bank or the Central Republic Bank and Trust Company one or more of the loans or discounts listed in schedule A of exhibit 5, the payment of which loans and advances was alleged to be guaranteed by the second guaranty of C. T. C. Investment Company, referred to as exhibit 6.

The Central Republic Bank and Trust Company also assigned to plaintiff as security for its indebtedness all of its assets except certain items designated "Total Cash Means." None of the notes, judgments, guaranties or agreements described in the amended complaint was included in "Total Cash Means."

Thereafter the Central Republic Bank and Trust Company changed its name to Central Republic Trust Company, and on June 11, 1934, it assigned to plaintiff all of its interest in and to the guaranty of C. T. C. Investment Company, referred to as exhibit 5. On November 21, 1934, a receiver was appointed for the Central Republic Trust Company, and Charles H. Albers is now the duly qualified acting receiver of that company. Thereafter, this receiver assigned to plaintiff all of his interest in and to the agreements referred to as exhibits 7 and 8, and in and to any and all causes of action accrued or to accrue thereunder.

Plaintiff now holds each of the loans, discounts and judgments described in paragraph 28 of the amended complaint, and there is due thereon the sum of $1,112,420.-97, together with interest.

The C. T. C. Investment Company was dissolved by decree of the Superior Court of Cook County, Illinois, May 20, 1933, which was more than six years prior to the filing of this complaint. At the time of its dissolution this company's assets consisted of the remainder of the identical assets, or proceeds thereof, delivered to it on June 29, 1929, as surplus assets of the Old Chicago Trust Company. The remaining assets are now being administered in the name of the C. T. C. Investment Company by the defendant Joseph Duner under an agreement, the terms of which are unknown to plaintiff. Those assets, though substantial, are not sufficient to pay in full the liability of C. T. C. Investment Company on its guaranties referred to in exhibits 5 and 6. All of the stockholders of C. T. C. Investment Company have a common interest in the subject matter of this suit, and the individual defendants, except Duner and Albers, are stockholders of C. T. C. Investment Company and are sued as individuals, and as such stockholders on behalf of all stockholders of that company.

C. T. C. Securities Company and C. T. C. Investment Company have suffered large losses by reason of the purchase of securities of Associated Light and Power Corporation and United Light and Power Company of Cuba, and by reason of loans to said companies and committees or corporations allied or affiliated with those companies. The exact amount of such loss is unknown

to plaintiff, but it exceeds $700,000. Plaintiff and its predecessors have suffered losses in the aggregate principal amount of $1,-112,420.97 by reason of the non-payment of the obligations listed in paragraph 28 of the amended complaint.

C. T. C. Investment Company has been unable to make good on its guaranties referred to as exhibits 5 and 6, because of losses sustained by it and C. T. C. Securities Company from the purchase of first mortgage bonds of the Union Light and Power Company of Cuba, and because of purchases of the securities of and loans to Associated Light and Power Corporation, Union Light and Power Company of Cuba, and committees or corporations allied or affiliated with those companies. Such purchases were made because of the obligation of Old Chicago Trust Company on its agreement to underwrite first mortgage bonds of the Union Light and Power Company of Cuba, which obligation was transferred to C. T. C. Investment Company.

Upon these allegations, which were not supported by oath, the plaintiff asked that the court decree:

"(a) That there is due to the plaintiff herein the principal sum of $1,112,420.97, together with interest thereon, upon the notes and judgments described in Paragraph 28 of the Complaint, payment of which was guaranteed by C. T. C. Investment Company;

"(b) That C. T. C. Investment Company has not paid the sums due thereon;

"(c) That an accounting be had of the transactions of C. T. C. Investment Company and C. T. C. Securities Company to determine the amount of losses, if any, incurred by C. T. C. Investment Company and C. T. C. Securities Company from the purchase of the securities of, or upon any loans to, Associated Light & Power Corporation and Union Power & Light Corporation of Cuba, or any committee or corporation in any way allied to or affiliated with either of said corporations;

"(d) That the defendants and each of them pay to the plaintiff such amount as may be necessary to pay the amount of the losses found by said decree to have been so sustained by C. T. C. Investment Company and C. T. C. Securities Company and The National Bank of the Republic of Chicago as reorganized and consolidated, but not in excess of 105% of the amount for which each such defendant agreed to be liable in agreements attached to this complaint as Exhibits VII and VIII, and that execution issue therefor;

"(e) That some person, firm or corporation be appointed Trustee or Receiver of the assets of C. T. C. Investment Company now in the custody of Joseph Duner or any other person, firm or corporation, said Trustee or Receiver to take possession of said assets and liquidate the same for the purpose first, of discharging, to the extent that such assets will go, the obligation of C. T. C. Investment Company upon its agreements referred to as Exhibits V and VI, and second distributing the balance of said assets, if any there be, to those persons whom the court may find to be entitled thereto."

Plaintiff first contends that the District Court erred in quashing the summons and dismissing the action as to the C. T. C. Investment Company. During the entire lives of that Company and the C. T. C. Securities Company, the Illinois Act of 1919, governing business corporations (Chap. 32, Ill. R.S.1929), was in force, under which both corporations were organized and both were dissolved. Pertinent sections of that Act are as follows:

"§ 14. All corporations organized under the laws of this State, whose powers may have expired by limitation or otherwise, shall continue their corporate capacity for two years for the purpose only of collecting debts due such corporation and selling and conveying the property and effects thereof. Such corporations shall use their respective names for such purposes and shall be capable of prosecuting and defending all suits at law or in equity."

"§ 53. After an adjudication of bankruptcy, or after an execution has been so returned, or has remained unsatisfied for more than ten days, after a demand made, or after dissolution or cessation of business leaving debts unpaid, any creditor may bring suit in equity, in any court having general jurisdiction in the county within which the principal office of the corporation is located, on behalf of himself and of all other creditors of the corporation, against all persons who are liable in any way for the debts of the corporation, by joining the corporation in such suit."

"§ 79. The dissolution, for any cause whatever, of any corporation, shall not take away or impair any remedy given against such corporations, its officers, or stockholders, for any liabilities incurred previous to its dissolution, if suit therefor is brought

and service of process had within two years after such dissolution." Smith-Hurd Stats. c. 32, §§ 157.94, 157.86, notes.

■ By virtue of the sections just quoted, as construed by the Illinois decisions, neither of these corporations had any capacity to sue, or be sued, nor to collect by suit or otherwise, any debt, or alleged debt, due it after May 20, 1935 the date of dissolution being May 20, 1933. Dukes v. Harrison & Reidy, 270 Ill.App. 372; Consolidated Coal Co. v. Flynn Coal Co., 274 Ill.App. 405; Sarelas v. McCue & Co., 291 Ill.App. 540, 10 N.E.2d 700. See also, Chicago Title & Trust Co. v. 4136 Wilcox Bldg. Corp., 302 U.S. 120, 58 S.Ct. 125, 82 L.Ed. 147.

Appellant, however, calls our attention to the fact that a new body of corporation law for Illinois was enacted in 1933, and that section 53 of the Act of 1919 was not carried forward into the 1933 Act. Hence, it says, the joinder of the corporation was unnecessary. Aside from requiring the joinder of the corporation in such suit, as required in Section 53, the substance of that section is set forth in the later enactment.

Section 157.86 of Chapter 32, Smith-Hurd Illinois Statutes, is the section of the Act of 1933, which the annotators say corresponds to Section 53 of the Act of 1919. It provides that "Courts of equity shall have full power to liquidate the assets and business of a corporation: * * * (b) Upon the suit of a creditor whose claim has either been reduced to judgment and an execution thereon returned unsatisfied, or whose claim is admitted by the corporation, * * *."

■ The omission from the later Act of the clause requiring the joinder of the corporation as a party defendant added no substantive rights to the plaintiff, nor did its inclusion in the Act of 1919, add to its substantive rights. The reason is that when judgment was rendered, and after a return of nulla bona, which each statute required as a condition precedent, at that moment a direct relationship was established between the plaintiff and the corporation's debtor, and it would be no longer reasonably necessary to require such joinder of the corporation.

Under the facts pleaded, it seems that it would be immaterial as to whether Section 53 of the Act of 1919 would apply here, or the later section of the 1933 Act. Plaintiff has complied with neither. It has no

judgment and returned execution, and of course it has no lien. It is to be noted, however, that section 163 of the Act of 1933 provided that a repeal of a law by that Act should not affect any right accrued or established, or any liability, or penalty incurred under the provisions of such law prior to the repeal thereof.

■ We think it is clear that the court did not err in quashing the summons or in dismissing the action against the C. T. C. Investment Company. There was no such entity at the time the summons was issued, and at that time it could neither sue nor be sued. Appellant now contends that the C. T. C. Investment Company was not a necessary party, but urges that it was a proper party. In support of this contention, it relies on other decisions which construe different statutes of other states. However, we cannot concern ourselves with statutes and decisions of other states in view of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487. Under the Illinois laws, in order to grant any relief demanded, we think that the C. T. C. Investment Company was an indispensable party defendant, in view of the allegations of the bill and the specific relief sought by the prayer which asked no general relief. However, we are convinced by the same authorities that it could not be joined because it had already been dissolved for more than two years. Hence, the motions to quash and to dismiss were properly sustained.

Appellant contends, however, that it can recover on the guaranties of the C. T. C. Investment Company, exhibits 5 and 6, against that company's property in the hands of its stockholders, although the company was dissolved more than two years prior to the filing of this action, and that in so doing it can sue the debtors of the company directly on any choses in action constituting part of its assets. This contention is based on the proposition that its bill is not a mere creditor's bill and that the dissolved corporation is not a necessary party, which fact renders immaterial, so far as other parties defendant are concerned, the court's ruling on the motion to quash.

Appellant's argument in this respect is that in equity the assets of a dissolved corporation, including its choses in action, pass to its stockholders as tenants in common; that in equity the assets of a dissolved corporation passing to its stock-

holders constitute a trust fund which can be reached in their hands by the corporation's creditors for the purpose of satisfying claims; and that therefore appellant can sue directly on those assets including choses in action.

Whether or not the complaint in this action amounts to a mere creditors' bill, it is worthy of note that but for the lack of an allegation of a judgment and an unsatisfied execution the bill and its prayer have all the necessary averments of a creditors' bill.

We think, however, that appellant's argument with respect to the creation of a trust is entirely too broad in its conclusions. There can be no doubt that in the earlier years of our jurisprudence considerable loose language was used with respect to trusts in cases such as this, which in later years has been somewhat modified. In Hollins v. Brierfield Coal & Iron Co., 150 U.S. 371, 14 S.Ct. 127, 129, 37 L.Ed. 1113, the plaintiff as a creditor of the company filed a bill to reach its assets, including unpaid stock subscriptions, as a trust fund for the benefit of corporate creditors, upon which he contended that they had a lien in equity. The court said:

"While it is true language has been frequently used to the effect that the assets of a corporation are a trust fund held by a corporation for the benefit of creditors, this has not been to convey the idea that there is a direct and express trust attached to the property. As said in 2 Pom.Eq. Jur. § 1046, they 'are not in any true and complete sense trusts, and can only be called so by way of analogy or metaphor.'

"To the same effect are decisions of this court. The case of Graham v. [La Crosse & M.] Railroad Company, 102 U.S. 148 [26 L.Ed. 106], was an action by a subsequent creditor to subject certain property, alleged to have been wrongfully conveyed by the corporation debtor, to the satisfaction of his judgment. And the very proposition here presented was then considered, and in respect to it, the court, by Mr. Justice Bradley, said (page 160): 'It is contended, however, by the appellant that a corporation debtor does not stand on the same footing as an individual debtor; that, whilst the latter has supreme dominion over his own property, a corporation is a mere trustee, holding its property for the benefit of its stockholders and creditors; and that if it fail to pursue its rights against third persons, whether arising out of fraud or otherwise, it is a breach of trust, and creditors may come into equity to compel an enforcement of the corporate duty. This, as we understand, is the substance of the position taken.

"'We do not concur in this view. It is at war with the notions which we derive from the English law with regard to the nature of corporate bodies. A corporation is a distinct entity. Its affairs are necessarily managed by officers and agents, it is true; but, in law, it is as distinct a being as an individual is, and is entitled to hold property (if not contrary to its charter) as absolutely as an individual can hold it. Its estate is the same, its interest is the same, its possession is the same. Its stockholders may call the officers to account, and may prevent any malversation of funds, or fraudulent disposal of property on their part. But that is done in the exercise of their corporate rights, not adverse to the corporate interests, but coincident with them.

"'When a corporation becomes insolvent, it is so far civilly dead that its property may be administered as a trust fund for the benefit of its stockholders and creditors. A court of equity, at the instance of the proper parties, will then make those funds trust funds, which, in other circumstances, are as much the absolute property of the corporation as any man's property is his.'

"With reference to the suggestion in this last paragraph, it may be observed that the court does not attempt to determine who are proper parties to maintain a suit for the administration of the assets of an insolvent corporation. All that it decides is, that when a court of equity does take into its possession the assets of an insolvent corporation, it will administer them on the theory that they in equity belong to the creditors and stockholders rather than to the corporation itself. In other words, and that is the idea which underlies all these expressions in reference to 'trust' in connection with the property of a corporation, the corporation is an entity, distinct from its stockholders as from its creditors. Solvent, it holds its property as any individual holds his, free from the touch of a creditor who has acquired no lien; free also from the touch of a stockholder who, though equitably interested in, has no legal right to, the property. Becoming insolvent, the equitable interest of the stockholders in the property, together with their conditional liability to the credi-

tors, places the property in a condition of trust, first, for the creditors, and then for the stockholders. Whatever of trust there is arises from the peculiar and diverse equitable rights of the stockholders as against the corporation in its property and their conditional liability to its creditors. It is rather a trust in the administration of the assets after possession by a court of equity than a trust attaching to the property, as such, for the direct benefit of either creditor or stockholder."

The court then discusses the cases of Wabash, St. Louis & Pacific Ry. Co. v. Ham, 114 U.S. 587, 5 S.Ct. 1081, 29 L.Ed. 235; Hawkins v. Glenn, 131 U.S. 319, 9 S.Ct. 739, 33 L.Ed. 184; Fogg v. Blair, 133 U.S. 534, 10 S.Ct. 338, 33 L.Ed. 721, and continues—

"These cases negative the idea of any direct trust or lien attaching to the property of a corporation in favor of its creditors, and at the same time are entirely consistent with those cases in which the assets of a corporation are spoken of as a trust fund, using the term in the sense that we have said it was used. * * *

"* * * Neither the insolvency of the corporation, nor the execution of an illegal trust deed, nor the failure to collect in full all stock subscriptions, nor, all together, gave to these simple contract creditors any lien upon the property of the corporation, nor charged any direct trust thereon. * *

"So here these plaintiffs were simple contract creditors when the trustee's suit was commenced. That suit passed to decree of foreclosure, and up to that time these plaintiffs had acquired no specific lien upon the property. * * * A decree of dismissal was, therefore, proper."

See, also, Gottlieb v. Miller, 154 Ill. 44, 39 N.E. 992; Johnson v. Canfield-Swigart Co., 292 Ill. 101, 126 N.E. 608; Fletcher, Cyclopedia Corporations (1919), Vol. 8, Sec. 5027, et seq.

A very similar state of facts was involved in Smith v. Ft. Scott, H. & W. Railroad Company, 99 U.S. 398, 400, 25 L.

Ed. 437. The court there said: "The relationship of the complainant to the company is that he is its creditor while the county is assumed to be, and perhaps is, its debtor. The complainant has no lien upon the fund he is seeking to reach. His case is, therefore, a common creditor's bill,—nothing more and nothing less."

We think these decisions are controlling, regardless of whether the allegations of the bill are termed a common creditors' bill, or a creditors' suit of any other character, legal or equitable. The sections of the statute to which we have referred, as well as Section 49 of the Chancery Act of Illinois, Smith-Hurd Stats. c. 22, § 49, governing creditors' bills, completely regulate and control both the substantive and procedural rights of the parties, under the facts here presented. These sections contain no pertinent limitations, either express or implied, nor has any rule of court been suggested, which warrants the conclusion that appellant may have other common law or equitable remedies under Section 1 of the Civil Practice Act. (Chapter 110, Ill.R.S.1939, Sec. 125.) Moreover, no other common law or equitable right or remedy is shown to exist.

Furthermore, it is contended by appellant that this is a class action, and is maintainable under 23(a) (1) (2) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c.[5] Paragraph 36 of the complaint, among other things, alleges that the present assets of the C. T. C. Investment Company are in the hands of Duner, and though substantial, they are not sufficient to pay in full the liability of the C. T. C. Investment Company upon its guaranties, Exhibits 5 and 6; that all the stockholders of that company have a common interest in the subject matter of this suit; that the individual defendants are stockholders of the company and are sued herein as individuals and as stockholders of the company on behalf of all stockholders thereof. It nowhere appears in the complaint that the stockholders are so numerous as to make it impracticable to bring

[5] "(a) Representation. If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, such of them, one or more, as will fairly insure the adequate representation of all may, on behalf of all, sue or be sued, when the character of the right sought to be enforced for or against the class is

"(1) joint, or common, or secondary in the sense that the owner of a primary right refuses to enforce that right and a member of the class thereby becomes entitled to enforce it;

"(2) several, and the object of the action is the adjudication of claims which do or may affect specific property involved in the action."

them before the court. Such an averment is quite necessary before plaintiff can avail itself of the rule. It is clearly inferable from the allegations of this paragraph that there are stockholders other than the stock holding defendants, and it seems that they should have been brought before the court, in the absence of an allegation of impracticability. Pelelas v. Caterpillar Tractor Co., 7 Cir., 113 F.2d 629.

Appellant further contends that the indemnity contract, Exhibit 8, was entered into for the direct benefit of the National Bank of the Republic; that it could have been enforced by that bank as a third party beneficiary thereof, and can now be enforced by appellant as the ultimate assignee of that bank. In this connection it relies largely on Carson Pirie Scott & Co. v. Parrett, 346 Ill. 252, 178 N.E. 498, 501, 81 A.L.R. 1262. The court in that case said: "The rule is settled in this state that, if a contract be entered into for a direct benefit of a third person not a party thereto, such third person may sue for breach thereof. The test is whether the benefit to the third person is direct to him or is but an incidental benefit to him arising from the contract. If direct, he may sue on the contract; if incidental he has no right of recovery thereon. This rule has been announced without variation in numerous cases decided by this court." That court in the same case further states: "The rule is that the right of a third party benefited by a contract to sue thereon rests upon the liability of the promisor, and this liability must affirmatively appear from the language of the instrument when properly interpreted and construed. The liability so appearing cannot be extended or enlarged on the ground alone that the situation and circumstances of the parties justify or demand further or other liability. Hageman v. Holmes, 179 Ill. 275, 53 N.E. 739."

■■ In the Carson case, the appellant had explicitly agreed to pay for the furnishings of a hotel in the event payment was not made by the initial contracting parties. Such facts are not analogous to those before us. The indemnity agreement, Exhibit No. 7, did not provide against loss which might arise from dissipation of the assets of the Investment Company which were supposed to be maintained for the benefit of the banks, but merely against loss resulting from failure to carry out the terms of the underwriting agreement. The C. T. C. Securities Company took up the note, hence there was no liability to be indemnified. The indemnitors in Exhibit 8 did not guarantee the payments of the same loans which the Investment Company had guaranteed under its own guaranty contracts, nor did they guaranty or promise to pay any loans or judgments. Exhibit 8 was a mere indemnity to the Securities Company and to the Investment Company against any loss that they might suffer because of the purchase of any of the securities of the Associated Power and Light Company or the United Light and Power Company of Cuba. These are matters which are entirely disconnected from the loans which had been guaranteed by the Investment Company. It must be borne in mind that the indemnitors in Exhibit 8 had signed no such guaranty as that found in Exhibit 6. To be sure, the court was bound to look at the entire agreement, as set forth in Exhibit 8, and construe the intention of the parties as the same appears in the language of the instrument, but we cannot construe it as being other than a simple indemnity agreement running to the Securities Company and the Investment Company. Any benefit running from that agreement to the bank, by any fair interpretation, must be considered as incidental, and the rule as laid down in the Carson case would not permit the appellant in this case to recover upon it. This conclusion is supported by Searles v. City of Flora, 225 Ill. 167, 80 N.E. 98; Seefeldt v. Wilgen, 193 Ill.App. 315; and Kilburg v. Petrolagar Laboratories, 280 Ill.App. 527. We see no contradiction between the rulings in the last-named cases and that in the Carson case. The difference in the conclusions was the result of purely factual differences.

■ The alleged intention of the parties to Exhibit 8 to benefit the National Bank of the Republic did not make the bank a third party beneficiary of that contract. Cherry v. Ætna Casualty & Surety Co., 372 Ill. 534, 25 N.E.2d 11; Corn Belt Bank v. Maryland Casualty Co., 281 Ill.App. 387.

Appellant further urges that if Exhibit 8 was not a contract for the benefit of a third person, the assignor of the appellant, it still is entitled to recover against the signers of that exhibit on the ground that appellant's assignor was subrogated to the rights of its debtor, C. T. C. Investment Company, against the individual signers of the exhibit. Appellant expresses its con-

tention in the following language: "This result is reached by the application of the equitable doctrine that a creditor is entitled to be subrogated to any security which his debtor may hold from a third person securing or indemnifying the debtor with respect to his debt to the creditor." In Dunlap v. Peirce, 336 Ill. 178, 168 N.E. 277, 282, 66 A.L.R. 181, the court said: "'Subrogation' is the substitution of another person in the place of a creditor or ·other person in the place of a creditor or ·claimant to whose rights he succeeds in relation to the debt or claim asserted, which has been paid by him involuntarily, and contemplates some original privilege on the part of him to whose place substitution is claimed. There must exist the relation of principal and surety or guarantors, or other relation between the parties which would entitle such person to succeed to any rights of the creditor or claimant. Fuller v. Davis' Sons, 184 Ill. 505, 56 N.E. 791; Bispham's Equity, § 335; Home Savings Bank v. Bierstadt, 168 Ill. 618, 48 N.E. 161, 61 Am.St.Rep. 146. * * *"

■ Here again we are confronted with certain decisions which have rather carelessly used the word "subrogation" as referring to a right available to any creditor who seeks to recover against a third person because of some relation existing between that third person and a debtor of the plaintiff. We cannot believe that this amounts to subrogation in its true sense. That construction would indeed cover a third party beneficiary. The distinction between the two is clearly set forth in the revised edition of Williston on Contracts, Vol. 2, section 384. There, in discussing the right of a mortgagee to take advantage of the promise of a vendee to assume the obligation of a mortgagor, Mr. Williston says: "The phrase commonly used is that the mortgagee is 'subrogated' to the rights of the mortgagor, who is the promisee. The use of the word 'subrogation' is not wholly fortunate. It suggests analogies which do not exist, with the position of a surety who has paid the debt." We are convinced that the rights of a creditor who seeks to recover directly against one who has allegedly agreed to pay the debt of the principal debtor are to be determined by the rules pertaining to third party beneficiaries. This subject is quite fully discussed by Mr. Williston in sections 347, 356, 361 and 402, and it is quite consistent with the Restatement of the Law of Contracts, sections 133 and 147, and is in accord with the decision in Carson Pirie Scott & Co. v. Parrett, 346 Ill. 252, 178 N.E. 498, 81 A.L.R. 1262.

Our research discloses that the right of a primary creditor to proceed directly against a third person who has secured or indemnified a debtor with respect to his debt to the creditor, is not discussed under the subject of subrogation but is treated exclusively under the subject of third party beneficiaries. Indeed, the cases upon which appellant relies, in which recovery was had directly against the third party by a creditor without the intervention of the primary debtor, are cases in which the third party had assumed and agreed to discharge, or in law was compelled to discharge the obligation of the primary debtor to the creditor.

■ Moreover, if there be subrogation here, appellant can have no greater rights under Exhibit 8 than C. T. C. Investment Company had. Subrogation means substitution, not assignment or transfer. The Investment Company's right thereunder was to sue upon Exhibit 8, upon default, at any time prior to the expiration of two years after the company's dissolution. That right was existent at the time Exhibit 8 was executed, and we think it cannot be enlarged by subrogation. We feel constrained to hold that appellant cannot be considered as a third party beneficiary, and we are further convinced that it cannot recover under the doctrine of subrogation.

In view of our expressed conclusions, it is unnecessary to pass on other questions presented.

Decree affirmed.