ROBERT H. SARVIS *vs.* HENRY E. COOPER, THIRD, & another.[1]

No. 94-P-91.

Essex. October 18, 1995. - May 23, 1996.

Present: PERRETTA, KASS, & IRELAND, JJ.

*Contract,* Construction of contract, Indemnity. *Indemnity. Arbitration,* Award. *Practice, Civil,* Summary judgment.

The provisions of a contract for the purchase and sale of a business supported the conclusion that the purchaser of indemnity rights under that contract, standing in the shoes of the bankrupt purchaser of the business, was entitled to indemnification from the principals of the seller business for negligence and breach of warranty in connection with a product of the seller sold prior to the closing of the sale of the business. [475-478]

A civil action was remanded for consideration of exactly when the alleged negligence and breach of warranty occurred, for purposes of determining whether the defendant's agreement to indemnify was applicable to make the defendant liable for the resulting damages. [478]

CIVIL ACTION commenced in the Superior Court Department on November 12, 1992.

The case was heard by *Elizabeth B. Donovan,* J., on motions for summary judgment.

*William F. Swiggart* for the plaintiff.

*Mark G. Matuschak* (*Michael G. Bongiorno* with him) for the defendants.

PERRETTA, J. On January 2, 1989, the plaintiff, Robert H. Sarvis, commissioned Able Marine Services, Inc. (AMS), to build a racing yacht, the Nantucket Splinter (Splinter).[2] During construction of the Splinter, Able Marine Inc. (AMI), purchased AMS. AMI completed construction of the Splinter

[1]Charles T. Cooper

[2]The yacht was actually named the "Corrival." Sarvis intended that the yacht be the first of a new class, the Splinter. At all times pertinent to the present dispute, the yacht was referred to as the Nantucket Splinter.

and delivered it to Sarvis. On August 20, 1989, while in the final leg of her first race, the Splinter's ballast keel parted from her hull. The yacht capsized and slowly turned upside down. The crew and Sarvis were rescued. Pursuant to his boat construction agreement with AMS, Sarvis submitted his claim to an arbitrator whose finding was to be final and binding. The arbitrator determined that the damage to the Splinter was the direct result of negligence in its construction and that there had been a breach of warranty. Before a judgment was entered in Superior Court against AMI on the arbitrator's decision, AMI filed for bankruptcy. Sarvis purchased AMI's indemnity rights under its purchase and sale agreement with AMS from the bankruptcy trustee and then, standing in AMI's shoes, brought this action seeking indemnification from the defendants.[3] On cross motions for summary judgment, a Superior Court judge concluded that AMI, and hence Sarvis, was entitled to be indemnified under a clause of the agreement which is subject to an aggregate limit of $100,000. On the parties' cross appeals, we conclude that although the Superior Court judge, as matter of law, correctly construed the agreements between AMS and AMI, Sarvis is entitled to recover only if it is determined that, as matter of fact, the Splinter's failure was caused by an act or omission of AMS. We, therefore, reverse the judgment.

1. *The contract between Sarvis and AMS.* It was agreed between the parties that AMS would construct the Splinter "in accordance with yacht building standards," that the price was to be determined on a "cost plus basis,"[4] that Sarvis would make periodic progress payments upon receipt of invoices, and that AMS would pay a penalty charge of $10,000 in the event work had not been completed by July 1, 1989. The parties further agreed that the drawings and designs for the Splinter were Sarvis's sole property, as were certain reusable fixtures, tools, molds and other equipment constructed for the specific purpose of building the Splinter. As previously stated, disputes and claims relating to the work under the contract

---

[3]Under the purchase and sale agreement between AMS and AMI, the defendants, who were principals in AMS, have individual joint and several liability with AMS.

[4]That is, the "sum of (1) material costs (the actual cost of materials to Builder) plus eleven (11) percent, and (2) labor expended in the construction of the yacht charged at the rate of $23.50 per hour."

were to be resolved by an arbitrator whose determination would be final and binding upon the parties.

2. *The arbitrator's decision.* The arbitrator found that a failure to install floor timber bolts during the construction of the yacht caused the Splinter's ballast keel to separate from her hull. He awarded Sarvis a total of almost $200,000 for the loss of his personal property on board, a tooling rebate, damages and shipment expenses on the yacht, the loss of its use, litigation expenses, and attorneys' fees.

Although a judgment on the arbitrator's decision was never obtained as to AMI, presumably because AMI filed for bankruptcy and triggered the automatic stay provision of 11 U.S.C. § 362 (a) (1988), there is a separate judgment confirming the award against AMS. The arbitrator's decision is, therefore, final and binding upon Sarvis and AMS. See *Glenn Acres, Inc.* v. *Cliffwood Corp.*, 353 Mass. 150, 156 (1967) ("G. L. c. 251, §§ 11 and 14, contemplate that the finality of an arbitrator's award is subject to and dependent upon the entry of a judgment or decree by the court").

3. *AMI's right to be indemnified by AMS.* After purchasing AMI's indemnity rights from its trustee in bankruptcy, Sarvis brought this action against the defendants, see note 3, *supra*, seeking indemnification under the asset purchase agreement between AMS and AMI, as well as under a side agreement. We take up the asset purchase agreement first. Section 7.2 of that agreement requires AMS to indemnify AMI against any liability resulting from claims set out in six categories, the following two of which are here at issue:

> "(i) Any and all obligations or liabilities of any of the Selling Parties which are *not*, by the express terms hereof, to be assumed by Buyer;
>
> " . . .
>
> "(vi) Any and all warranty, product liability, personal injury and death claims made against Buyer or related liabilities in connection with any products sold or services provided since the inception of the Business and prior to the Closing" (emphasis supplied).

Section 7.3 of the agreement limited the indemnification provided by § 7.2 (vi) to "$100,000 in the aggregate."

Under the side agreement, AMS warranted that the Splinter would be timely completed so that the $10,000 late-delivery penalty provided for in the contract with Sarvis would not be incurred. AMS also agreed to indemnify AMI up to fifty per cent of any amounts due from Sarvis but compromised by AMI because of budget overruns. Any monies paid by AMS under the side agreement were not to be applied against the $100,000 limit set out in § 7.3 of the asset purchase agreement. Sarvis seeks to exercise AMI's rights under the side agreement on the basis of his claim that he paid AMI $32,108.80 less than billed on account of the $10,000 penalty due for the late delivery of the Splinter and for budget overruns in the amount of $22,108.80.

The primary issue raised on the cross motions for summary judgment and the cross appeals is whether AMI's right to be indemnified for the damages and expenses pertaining to the Splinter is found in § 7.2 (i), as Sarvis argues, or in § 7.2 (vi), if at all, as the Coopers contend. The Superior Court judge determined that because AMI expressly had assumed all AMS's obligations and liabilities in respect to the Splinter, AMI's right to indemnification was under § 7.2 (vi) as limited by § 7.3. The decision makes no mention of specific claims under the side agreement and the amounts sought thereunder, and Sarvis pursues those claims on his appeal.

4. *Interpretation of the asset purchase agreement.*[5] In concluding that AMI had assumed all the obligations and liabilities pertaining to the Splinter, the Superior Court judge relied upon § 3.4 of the asset purchase agreement which, as relevant, provides:

> "Buyer hereby assumes and agrees to pay and perform, promptly when due, all of Seller's liabilities and obligations under and pursuant to the following:
>
> (a) The Unfilled Orders set forth in the schedule described in Section 4.4 (r);
>
> . . .
>
> [paragraphs (b) through (g) omitted]."

Sarvis cannot and does not dispute that the Splinter is

[5]Sarvis's claims for indemnity through AMI under the side agreement do not involve any questions of law.

specifically included in the schedule of unfilled orders set out in § 4.4 (r) of the agreement. He argues, however, that although AMI assumed liability for the Splinter under § 3.4, that assumption was thereafter limited by § 3.5 which states, in pertinent part:

> "*Notwithstanding* anything to the contrary contained in Section 3.4 or otherwise in this Agreement, it is expressly agreed that Buyer will not be required to assume, and is not assuming, at the Closing any obligations or liabilities of Seller *not specifically* set forth in Section 3.4, including without limitation the following:

> (i) Any and all claims, liabilities, obligations, costs and expenses arising out of or incurred in connection with claims, suits or proceedings, and any judgments or settlements arising from any claims, suits or proceedings, with respect to any transaction, event, act or omission occurring prior to the Closing Date, including, without limitation, the matters referred to in the schedule described in Section 4.4 (i) . . ." (emphasis supplied).

Sarvis sees an "apparent conflict between the 'notwithstanding' phrase and the 'not specifically set forth' language" of § 3.5. This conflict, he argues, can be reconciled by reading § 3.4 to provide for AMI's assumption of the obligation to complete the construction of the Splinter while, notwithstanding that assumption, specifically excluding liability under § 3.5 for the work done on the Splinter by AMS prior to the closing date of the sale, May 26, 1989.

All parties proclaim the agreement to be clear and unambiguous but proceed to differ sharply about what it means. Interpretation of the agreement is a question of law. See *Sparks* v. *Microwave Assocs., Inc.,* 359 Mass. 597, 600 (1971); *Bottom Line Assocs., Inc.* v. *International Data Group, Inc.,* 18 Mass. App. Ct. 921, 922 (1984). "A contract is to be construed to give reasonable effect to each of its provisions. *McMahon* v. *Monarch Life Ins. Co.,* 345 Mass. 261, 264 (1962). '[E]very phrase and clause must be presumed to have been designedly employed, and must be given meaning and effect, whenever practicable, when construed with all the other phraseology contained in the instrument, which must

be considered as a workable and harmonious means for carrying out and effectuating the intent of the parties.' *Charles I. Hosmer, Inc.* v. *Commonwealth,* 302 Mass. 495, 501 (1939)." *J.A. Sullivan Corp.* v. *Commonwealth,* 397 Mass. 789, 795 (1986).

As we read the "notwithstanding" language of § 3.5, it emphasizes rather than contradicts the statement that AMI did not assume any liability or obligation "not specifically set forth in § 3.4." Under § 3.4, AMI did specifically assume "*all* of Sellers's liabilities and obligations" in respect to the Splinter (emphasis supplied). AMI, therefore, has no right to indemnification under § 7.2 (i), which imposed indemnity in cases where AMI had *not* assumed liability.

Our reading of §§ 3.4 and 3.5 is consistent with Sarvis's notion that the agreement reflects the parties' intention to transfer an ongoing business while excluding liability for the past acts of the prior owner. AMI is, however, entitled to be indemnified under § 7.2 (vi) for "warranty, product liability, personal injury and death claims made against Buyer or related liabilities in connection with any . . . services provided since the inception of the Business and prior to the Closing." Accordingly, AMS was not relieved of liability for its work on the Splinter.

Further support for our conclusion, that AMI's right to indemnity for the Splinter is found in § 7.2 (vi) and not § 7.2 (i), is found in the fact that § 7.3 limits indemnity under § 7.2 (vi) to $100,000. When the terms of the contract between Sarvis and AMS are recalled (the Splinter was to be constructed on a "cost plus basis" in exchange for periodic progress payments upon receipt of invoices), the consistency of the limitation in § 7.3 with the intention to transfer an ongoing business while allocating liability to the party who performed the work is readily apparent.

Claiming on their cross appeal that AMI has no indemnity rights under § 7.2, the Coopers point to § 7.2 (iv) which provides AMI with indemnification for:

> "Any and all claims made against Buyer or its nominees for or with respect to the work in process and other assets relating solely to the yacht design commonly referred to as the 'Raquel' yacht or the assets presently used in the Business which assets are presently owned by PortAble."

They rely upon the "doctrine of exclusion by implication," *Allstate Ins. Co.* v. *Bearce,* 412 Mass. 442, 447 (1992), and argue that the specific provision for the Raquel shows that AMS and AMI did not intend AMI to have any right to be indemnified in respect to the Splinter.

"The principle of construction invoked, namely, that the expression by the parties in a written instrument of certain things indicates their intention to exclude other unmentioned things, applies where it may reasonably be inferred that if the parties intended to include subjects to which no reference is made in the instrument they would have done so by the addition of appropriate words. This, of course, is not an arbitrary rule to be applied, without consideration of the language of an instrument read as a whole, to bar reasonable inferences of a contrary intention." *Hamlen* v. *Rednalloh Co.,* 291 Mass. 119, 123 (1935). See also *Allstate Ins. Co.* v. *Bearce,* 412 Mass. at 447. The Coopers' argument is refuted by consideration of the entire agreement in the light of the undisputed circumstances concerning the Raquel.

Although it appears that work was being done on both the Splinter and the Raquel at the time of the closing, the Splinter was expressly included in the schedule of unfilled orders set out in § 4.4 (r) of the agreement whereas no reference was there made to the Raquel. Further, the Splinter was specifically excluded from the agreement's definition of "Unbilled Work in Process." This exclusion is consistent with the term of Sarvis's contract with AMS that required him to make periodic progress payments upon receipt of invoices.[6]

According to an undisputed affidavit, work on the Raquel by AMS had not been going well. About a month before the closing date, the repairing and upgrading of the Raquel was the largest project in the boatyard. The estimated cost for the work was $150,000. As of the closing date, the actual cost of the work done had exceeded the estimate by "thousands of dollars," completion deadlines had been extended several times, dissatisfaction with the progress and quality of the work had been expressed on several occasions, and relations between AMS and the Raquel's owner were "strained."

Because these circumstances would warrant different treatment of the Raquel in the agreement, we do not think it rea-

---

[6]According to invoices in the record appendix, Sarvis had paid, as of two days prior to the closing, $29,000 and owed, with the most recent bill, $30,462.72.

sonable to infer that by making specific reference to that yacht in § 7.2 (iv) of the agreement, AMS and AMI intended to exclude the Splinter from the separate and otherwise applicable indemnity provision set out in § 7.2 (vi). Cf. *Horvitz* v. *Zalkind*, 332 Mass. 125, 128-129 (1954).

5. *Disputed facts.* Whether Sarvis is in fact entitled to be indemnified on AMI's rights under § 7.2 (vi) depends upon whether the Splinter's floor timber bolts should have been installed prior to May 26, 1989. The Superior Court judge entered judgment for Sarvis on the basis of the arbitrator's decision which she read as constituting a finding that the damage to the Splinter was the "direct result of AMS's negligence and breach of warranty."

Because of the asset purchase agreement, the arbitrator's decision makes frequent collective reference to AMS and AMI as "Able." Indeed, at the time of the arbitration proceedings, there was no need to determine whether the negligence and breach of warranty were attributable to AMS or to AMI, and the arbitrator specifically made note of that fact. By reason of Sarvis's purchase of AMI's indemnity rights from its trustee in bankruptcy, these questions of fact are now material.

There are competing affidavits on the matter of when the floor timber bolts should have been installed. Sarvis's argument to the contrary is based upon questions of credibility and the weight of the evidence. Such matters are not considered on summary judgment. See *Attorney Gen.* v. *Bailey*, 386 Mass. 367, 370, cert. denied, 459 U.S. 970 (1982).

Turning to the claims raised under the side agreement, we think that Sarvis's affidavit and attached bill from AMI were sufficient to show that Sarvis received a "charge off" of $22,108.80. The materials cited by the Coopers in contradiction of Sarvis's affidavit only serve to support our conclusion that a factual dispute exists on the issue of AMI's right to be indemnified for fifty per cent of any amounts compromised on account of budget overruns.

Relying on the late-delivery penalty provision in his contract with AMS, Sarvis claims he withheld $10,000 from his payment to AMI for the Splinter. He argues that AMI is entitled to be indemnified for AMS's breach of the warranty it gave in the side agreement, that is, that construction on the Splinter was "on schedule" and would be timely delivered.

This claim is not asserted in Sarvis's complaint as twice amended and appears to be made for the first time on appeal. See *Trustees of Stigmatine Fathers, Inc.* v. *Secretary of Admn. & Fin.*, 369 Mass 562, 565 (1976); *Cheschi* v. *Boston Edison Co.*, 39 Mass. App. Ct. 133, 138-139 (1995). Were we to consider it, we would conclude that the mere fact that the Splinter was not timely delivered to Sarvis does not establish a breach of warranty by AMS.

To recapitulate: There are two claims under the asset purchase and side agreement which involve disputed facts: whether AMS or AMI should have installed the Splinter's floor timber bolts and the amount, if any, of the overruns on the Splinter's budget.

6. *Conclusion.* It follows from what we have said that the judgment is reversed and the matter remanded to the Superior Court for further proceedings.

*So ordered.*