Garsh, E. Susan, J.
Plaintiff Michael Feldman filed this action against Aspen Technology, Inc. (“Aspen”), Hunter Acquisition Corp., and Mary Cotton alleging securities fraud, common-law fraud, breach of contract, and violation of General Laws Chapter 93A in connection with Aspen’s acquisition of his software business. This matter is before the court on the defendants’ motion to dismiss the complaint pursuant to Mass.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted, pursuant to Mass.R.Civ.P. 9(b) for failure to plead fraud with particularity, and pursuant to Mass.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction. For the reasons discussed below, the defendants’ motion is DENIED.
BACKGROUND
For purposes of this motion, this Court accepts as true the following allegations set forth in the plaintiffs complaint. In September of 1985, Feldman formed the M. Bos Company, later renamed Houston Consulting Group, Inc. (“Houston Consulting”). Houston Consulting was a successful software company that supplied innovative software designed by Feldman, as well as consulting services, to companies involved in process industries such as oil and gas, petroleum, chemicals, pharmaceuticals, and other industries that manufacture and produce products from chemical processes. Houston Consulting’s primary software product was the ORION system for scheduling operations of petroleum refineries. ORION was the leading software package of this type worldwide and was licensed by numerous oil companies including Conoco Phillips, Total, Mobil, and Marathon. Feldman was the sole beneficial owner and manager of HCG Management, LLC, a Texas limited liability company, and HCG Investments, LLC, a Delaware limited liability company, the owners of all of the limited partnership interests in Houston Consulting.
Aspen is a supplier of software to process industries. Defendant Hunter Acquisition Corp. is a wholly owned subsidiary of Aspen, and Mary Cotton is a former Chief Operating Officer for Aspen. In May of 2001, representatives of Aspen contacted. Feldman and expressed an interest in acquiring Houston Consulting. Feldman met with Aspen representative Mike Catt (“Catt”) on May 8, 2001, after which he met with Aspen’s investment banker, First Union Securities (“First Union”). Although Feldman wanted a cash transaction, Aspen insisted on a stock transaction. On May 16, 2001, Feldman met with Cotton, Catt, and First Union. Cotton and First Union made a presentation concerning Aspen’s business and financial condition and provided Feldman with Aspen’s summary financial data for the years 2000 and 2001. No representative of Aspen ever disclosed or acknowledged any problems or improprieties with respect to Aspen’s accounting and financial information.
In June of 2001, Feldman agreed to sell Houston Consulting for $8 million in restricted Aspen stock. To induce the sale, the defendants falsely represented that the Aspen stock Feldman was receiving was worth *343 $8 million. The defendants also falsely represented that Aspen’s filings with the United States Securities and Exchange Commission (“SEC”) dating from July 1, 2000 to the date of the acquisition, including its fiscal year 2000 Annual Report in Form 10-K, complied with the Exchange Act and did not contain any false or misleading statements of material fact. On June 15, 2001, Feldman and the defendants reached an Agreement and Plan of Merger (“Agreement”) in which Aspen acquired Houston Consulting in exchange for 323,324 shares of Aspen common stock, purportedly worth $8 million. Aspen’s closing stock price on June 21, 2001 was $24.63 per share. In Article IV of the Agreement, the defendants represented and warranted that:
Aspen has previously furnished or made available to HCG complete and accurate copies, as amended or supplemented, of its (a) Annual Report on Form 10-K for the fiscal year ended June 30, 2000, as filed with the [SEC], and (b) all other reports filed by Aspen under Section 13 or subsections (a) or (c) of Section 14 of the Exchange Act with the SEC since July 1, 2000 (such reports are collectively referred to herein as the “Aspen Reports") . . . The Aspen Reports complied in all material respects with the requirements of the Exchange Act and the rules and regulations thereunder when filed. As of their respective dates, the Aspen Reports did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. The audited financial statements and unaudited interim financial statements of Aspen included in the Aspen Reports (i) complied as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto when filed, (ii) were prepared in accordance with U.S. generally accepted accounting principles applied on a consistent basis throughout the periods covered thereby (except as may be indicated therein or in the notes thereto, and in the case of quarterly financial statements, as permitted by Form 10-Q under the Exchange Act), (iii) fairly present the consolidated financial condition, results of operations and cash flows of Aspen as of the respective dates thereof and for the periods referred to therein, and (iv) are consistent with the books and records of Aspen.
Feldman relied on the defendants’ representations concerning the accuracy and truth of the Aspen Reports, Aspen’s financial condition, and the value of the Aspen stock in agreeing to accept stock for the sale of his business. However, the defendants’ representations as to Aspen’s financial condition and the value of Aspen stock were materially false and misleading. Feldman sold all 323,324 shares of Aspen stock between October 2001 and October 2002. Feldman’s losses on the sale of Aspen stock exceed $5 million.
On October 27, 2004, Aspen issued a press release announcing that its Audit Committee had commenced a detailed investigation of Aspen’s accounting for certain software license and service agreement transactions entered into with several partners and customers during fiscal years 2000 through 2002. The Audit Committee’s investigation was later expanded to include transactions entered into during fiscal years 1999, 2003, and 2004.
On March 15, 2005, Aspen issued a press release admitting that several software license transactions from fiscal years 1999 through 2002 had been accounted for improperly and that the license revenues associated with those transactions had been misstated in fiscal years 1999 through 2004. Aspen admitted that accounting for software license sales to resellers should have been recorded on a sell-through or consignment basis, rather than a sell-in or upfront basis, resulting in the deferral of license revenues from the period in which they were originally recorded to the period in which the software licenses were sold by the resellers to end users. As a result, Aspen admitted that its financial statements for fiscal years 2000 through 2004 had to be restated. On March 15, 2005, Aspen filed an amended Form 10-K for fiscal year 2004, restating its financial statements for each of the six consecutive years ending June 30, 2004. The amended fiscal 2004 Form 10-K stated:
This Amendment No. 1 on Form 10-K/A to our Annual Report on Form 10-K for the fiscal year ended June 30, 2004, originally filed with the United States Securities and Exchange Commission (SEC) on September 13, 2004, is being filed for the purpose of restating our consolidated balance sheets as of June 30, 2003 and 2004 and consolidated statements of operations, statements of stockholders’ equity and comprehensive income (loss), statements of cash flows and related disclosures for the years ended June 30, 2002, 2003 and 2004. See Note 18 to the Consolidated Financial Statements for a discussion of the restatement. Items 6, 7, 8, 9A andl5 have been updated for the effects of the restatement and are included in this Amendment No. 1.
We have not amended our Annual Reports or Form 10-K for the fiscal years ended June 30, 1999, 2000, 2001, 2002, or 2003, or our Quarterly Reports on Form 10-Q for the quarterly periods included in these fiscal years, that reflect the effects of the restatement. The information that has been previously been filed or otherwise reported for these periods is superseded by the information in this Form 10-K/A, and the financial statements and related financial information contained in such annual and quarterly reports should not be relied on.
*344 Aspen’s originally reported fiscal 2000 and fiscal 1999 revenues were materially overstated by at least $7.0 million and $6.8 million, respectively, due to improper recognition of license, service, and maintenance revenues on contingent and consignment sales to resellers and other customers. As a result of the restatements, total revenues for fiscal year 2001 decreased $12.5 million or 4%, and total revenues for fiscal year 2000 decreased $7.0 million or 3%. Net income in fiscal years 2001 and 2000 decreased by $16.4 million and $8.7 million, respectively. At the time the defendants induced Feldman to accept Aspen stock for the s ale of his comp any, they knew of Aspen’s improper accounting practices, knew that Aspen’s financial statements were not accurate, and knew that the value of the 323,324 shares of stock offered to Feldman was worth less than $8 million.
On June 9, 2006, Aspen announced that it had received a Wells Notice letter of a possible civil enforcement action by the SEC regarding its filing of the original financial statements for fiscal years 2000 through 2004. On July 7, 2006, Aspen announced that its former chief executives, Lawrence Evans and David McQuillin, and its former chief financial officer, Lisa Zappala, had also received Wells Notice letters from the SEC of a possible civil enforcement action regarding Aspen’s filing of the original financial statements for fiscal years 2000 through 2004. v
Feldman filed, this action on July 17, 2006. Count I of the complaint alleges a violation of General Laws Chapter 110A, Section 410, the Uniform Securities Act. Count II alleges breach of contract and breach of warranty based on the statements in Article IV of the Agreement. Count III alleges common-law fraud, and Count IV alleges violation of General Laws Chapter 93A, Section 11.
DISCUSSION
I. Dismissal under Rule 12(b)(6)
The purpose of Mass.R.Civ.P. 12(b)(6) is to permit prompt resolution of a case where the allegations in the complaint clearly demonstrate that the plaintiffs claim is legally insufficient. Harvard Crimson, Inc. v. President and Fellows of Harvard Coll., 445 Mass. 745, 748 (2006). When evaluating the sufficiency of a complaint pursuant to Rule 12(b)(6), the court accepts as true all of the factual allegations of the complaint and draws all reasonable inferences from the complaint in favor of the plaintiff. Id. at 749; Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 45 (2004). A complaint should not be dismissed for failure to state a claim unless it appears certain that the plaintiff is not entitled to relief under any state of facts which could be proved in support of his claim. Id. It is a relatively light burden to maintain a complaint in the face of a Rule 12(b)(6) motion. Warner-Lambert Co. v. Execuquest Corp., 427 Mass. 46, 47 (1998).
The defendants contend that Count I of the complaint fails to state a claim upon which relief can be granted for violation of G.L.c. 110A, §410. That provision of the Uniform Securities Act (“the Act”) provides in relevant part:
(a) Any person who . . .
(2) offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person buying the security from him .. .
For purposes of the Act, a sale of securities “includes eveiy contract of sale of, contract to sell, or disposition of, a security or interest in a security for value.” G.L.c. 11OA, §401 (i) (1). Exempted from the definition of a sale of securities, and thus regulation under the Act, is:
any act incident to a class vote by stockholders, pursuant to the certificate of incorporation or the applicable corporation statute, on a merger, consolidation, reclassification of securities, or sale of corporate assets in consideration of the issuance of securities of another corporation.
G.L.c. 110A, §401 (i) (6) (C). The exemption of a transaction or exception from a definition under the Act is an affirmative defense, and the burden of proving such an exemption rests upon the person claiming it. G.L.c. 110A, §402(d). See also Commonwealth v. David, 365 Mass. 47, 54 (1974). The defendants contend that because the June 15, 2001 Agreement and Plan of Merger (“Agreement”) executed by the parties states that Houston Consulting will be merged into Aspen Technology, Inc., the transaction is exempt under G.L.c. 110A, §401(i)(6)(C).[2] However, exemption from the definition of a sale of securities under G.L.c. 110A, §401 (i) (6)(C) requires not only a merger but also an “act incident to a class vote by stockholders.” It simply is not clear from the pleadings whether such a vote in fact occurred in this case. Thus, this Court cannot at this stage say beyond doubt that the transaction described in the complaint is outside the purview of the Act, such that Feldman is not entitled to relief under any state of facts which could be proved in support of his claim. See Harbourvest Int’l Private Equity Partners II v. Axent Tech, Inc., 2000 WL 1466096 at *8 (Mass.Sup.Ct. Aug. 31, 2000) (Burnes, J.) [12 Mass. L. Rptr. 323] (denying defendant’s motion for summary judgment on ground that merger was exempt from regulation under Uniform Securities Act where there were material issues of fact concerning whether transaction was consolidation or merger or subject to shareholder vote within meaning of the Act). Cf. Galvin v. The Gillette Co., 2005 WL 1155253 at *5 (Mass.Sup.Ct. April 28, 2005) (van Gestel, J.) [19 Mass. L. Rptr. 291] (transaction in which two publicly traded companies were merged by stock exchange upon vote of respective shareholders not regulated by the Act). *345 Accordingly, the defendants’ motion to dismiss Count I of the complaint on that ground must be denied.[3]
The defendants alternatively contend that the complaint fails to state a claim under the Act because §410 does not provide a remedy for those who purchase securities in an offering in which there is no prospectus. It is clear from the complaint and the Agreement that the transaction in this case involved a private sale of unregistered, restricted shares of stock. The defendants base their argument on case law concluding that § 12(a) (2) of the Federal Securities Act of 1933 does not apply to private securities transactions. The Legislature has directed our courts to interpret Chapter 110A in coordination with the federal statute. Marram v. Kobrick Offshore Fund Ltd, 442 Mass. at 50. Because G.L.c. 110A, §410(a)(2) is almost identical to §12(2) of the Securities Act of 1933, the court looks to federal decisions under §12(2) as well as the plain language of the statute and state appellate decisions in interpreting §410(a) (2). Id at 51. However, there is at least one significant difference between §12(2) of the Federal statute and §410(a)(2) of the Act. Section 12(2) imposes civil liability, in relevant part, on any person who:
offers or sells a security... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission . . .
15 U.S.C. §771(a)(2) (emphasis added). The United States Supreme Court has concluded that “prospectus” as used in § 12(2) is a term of art referring to documents describing an initial public offering of securities which must contain certain information as set forth in §10 of the Securities Act of 1933, and does not extend to private contracts for the sale of securities. Gustafson v. Alloyd Co., 513 U.S. 561, 568-71 (1995). From this ruling, courts have concluded that the civil liability provisions of §12(2) do not apply to private transactions, whether primary or secondary offerings. See Maldonado v. Dominguez, 137 F.3d 1, 8 (1st Cir. 1998); Yung v. Lee, 432 F.3d 142, 148-49 (2d Cir. 2005).
In contrast, §410(a)(2) of the Act makes no reference to a prospectus and imposes liability on any person who “offers or sells a security by means of any untrue statement of a material fact or any omission...” G.L.c. 110A, §410(a)(2). Given this plain language, it would be inappropriate to imply a prospectus requirement into the Act and then to dismiss Count I on the basis that liability under §410(a) (2) is limited to public offerings of securities in which a prospectus is required. See Anheuser-Busch Co., Inc. v. Summit Coffee Co., 934 S.W.2d 705, 708 (Tex.App. 1996) (where state securities statute omits “prospectus” language of §12(2) of Securities Act of 1933, it has broader scope and applies to private, secondary transactions).
Finally, with respect to Count I, the defendants contend that it fails to state a claim under §410 (a) (2) of the Act because Feldman was not the purchaser of the securities. Under §410(a)(2), the seller of securities is liable for fraud “to the person buying the security from him.” The defendants emphasize that under the Agreement, Houston Consulting and HCG Management, Inc. (“the Partners”), not Feldman, purchased the shares of Aspen stock, and Feldman received the shares only as a distribution without consideration. The Agreement states that the Partners are making an investment decision to acquire the Aspen shares, which will ultimately be distributed to Feldman. However, the Agreement also requires Aspen to deliver to Feldman, as designee of Houston Consulting and HCG Management, a certificate in Feldman’s name representing 290,992 of the Aspen shares, with the remainder to be placed in escrow. There is some support for the proposition that where a corporation sells its assets and receives stock in return, and the agreement designates the corporation as the “seller,” the corporation, and not its sole owner and shareholder, is the “purchaser" for purposes of a fraud claim under federal and state securities laws. Kroc v. Curaflex Health Services of Illinois, 1989 WL 100000 at *4 (N.D.Ill. Aug. 22, 1989) (dismissing individual shareholder as plaintiff of claim under §12(2) of Securities Act of 1933 and state securities act where corporations were also named plaintiffs) . Even assuming that Feldman did not purchase the stock from Aspen for purposes of §410(a) (2) of the Act, misjoinder or nonjoinder of parties is not a ground for dismissal because it is appropriate to permit substitution of Houston Consulting and HCG Management as plaintiffs to Count I. See Mass.R.Civ.P. 21. Cf. Kroc v. Curaflex Health Services of Illinois, 1989 WL 100000 at *4 (N.D.Ill. Aug. 22, 1989) (noting that court would probably let sole shareholder stand as plaintiff under §12(2) of Securities Act of 1933 if actual corporate purchaser were unable or unwilling to bring cause of action). Accordingly, Count I of the complaint is not subject to dismissal at this time on the ground urged by the defendants.
The defendants next contend that Article VII of the Agreement bars all non-fraud claims.
Section 7.2 of Article VII provides:
Indemnification by Aspen. Aspen shall indemnify the Partners and the [plaintiff] in respect of, and hold them harmless against, any and all Damages incurred or suffered by the Partners or the [plaintiff] resulting from, relating to or constituting any misrepresentation, breach of warranty or failure to perform any covenant or agreement of Aspen or the Merger Subsidiary contained in this Agreement.
The contractual term “Damages” is defined in Section 7.1 of the Agreement to include “losses.” Section 7.3 of Article VII defines the term “Indemnified Party” as any party “entitled, or seeking to assert rights, to indemnifi *346 cation under this Article VII.” That section goes on to discuss notice of suit by a third party and assumption of control of defense in Section 7.3(a), to set forth an optional ADR procedure after receipt of a response to a §7.3(a) notice of third party claim in Section 7.3(d), and to discuss payment of third party claims in Section 7.3(e). Section 7.4 of Article VII provides in relevant part:
Survival of Representations and Warranties. All representations and warranties contained in this Agreement shall (a) survive the Closing and any investigation at any time made by or on behalf of an Indemnified Party and (b) shall expire at the close of business on June 15, 2003; provided, however, that the representations and warranties contained in (I) Sections 2.1,2.2, 2.3 and 3.1 shall not expire, (iii) [sic] Section 2.0 shall expire on the thirtieth day after the expiration of the applicable statute of limitations, and (iv) Section 2.22 shall expire on June 15, 2006. After expiration of a representation or warranty, no Claim Notice may be delivered based upon a breach of such representation or warranty.
Section 7.5(b) of Article VII provides:
Except with respect to claims based on fraud, after the Closing, the rights of the Indemnified parties under this Article VII and the Escrow Agreement shall be the exclusive remedy of the Indemnified Parties with respect to claims for monetary damages resulting from or relating to any misrepresentation, breach of warranty or failure to perform any covenant or agreement contained in this Agreement.
The interpretation of a contract is a question of law for the court. Sarvis v. Cooper, 40 Mass.App.Ct. 471, 475 (1996). A contract is to be construed to give reasonable effect to each of its provisions. Id. “The object of the court is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background and purpose.” USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116 (1989). The starting point must be the actual words chosen by the parties to express their agreement. A contract is ambiguous only where the language at issue is susceptible of more than one meaning and reasonably intelligent persons would differ as to which of two or more meanings is the proper one. Lumbermens Mutual Casualty Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995); Jefferson Ins. Co. of New York v. Holyoke, 23 Mass.App.Ct. 472, 475, rev. den., 399 Mass. 1104 (1987). An ambiguity is not created simply because a controversy exists between the parties over the proper interpretation. Id.
Article VII read as a whole does not limit its application to third-party claims. The definition of the term “damages” as well as the obligation to indemnify is extremely broad. Furthermore, section 7.4 is unambiguous that the warranty at issue expired prior to the commencement of this action.
Aspen is not, however, entitled to dismissal of any of the counts of the complaint based upon the Agreement. Count I alleges violations of the Uniform Securities Act; although these alleged violations would not have occurred but for the Agreement, the cause of action seeks to enforce the Securities Act and not the Agreement and is not barred by the Agreement. Count II can be read as stating a claim based on fraud, the misrepresentations being those contained in the warranties found in Article IV. Count IV, the Chapter 93A claim, also fairly can be characterized as a claim based on fraud. Finally, Count III is a common-law fraud count, which Aspen concedes is not barred by the Agreement. Accordingly, the motion to dismiss for failure to state a claim based upon the Agreement is denied.
II. Dismissal under Mass.R.Civ.P. 9(b)
The defendants contend that the fraud counts are subject to dismissal under Mass.R.Civ.P. 9(b), which requires all averments of fraud to be stated with particularity. To establish a common-law claim of fraud, the plaintiff must show that the defendant made a false representation of material fact, with knowledge of its falsity, in order to induce the plaintiff to act, and that the plaintiff relied on the representation to his damage. Danca v. Taunton Sav. Bank, 385 Mass. 1, 8 (1982); Stolzoff v. Waste Sys. Int’l, Inc., 58 Mass.App.Ct. 747, 759 (2003). To satisfy Rule 9(b), the plaintiff must allege the content of the fraudulent statement, who made the statement and when and where it was made, the falsity of the statement and the defendant’s knowledge of the falsify, the materiality of the statement, and the plaintiffs reliance thereon. Friedman v. Jablonski, 371 Mass. 482, 488 (1976); Equipment & Systems for Industry, Inc. v. Northmeadows Construction Co., Inc., 59 Mass.App.Ct. 931, 931-32 (2003). Feldman’s complaint alleges that Aspen sold its common stock in exchange for Feldman’s ownership interest in Houston Consulting, that Aspen misrepresented the truth and accuracy of the financial information contained in the Aspen Reports, that the Aspen Reports overstated the company’s revenues for the fiscal years 1999 through 2001, that Aspen knew that the Aspen Reports were false and misleading and were not prepared in accordance with generally accepted accounting procedures, and that Feldman relied on Aspen’s representations in selling his company and was damaged as a result.
Aspen contends, however, that these allegations are too general to comply with Rule 9(b). Aspen relies on a body of federal law analyzing the sufficiency of complaints under Fed.R.Civ.P. 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. §78u-4, which imposes heightened pleading requirements on federal securities actions. See, e.g., Aldridge v. A.T. Cross Corp., 284 F.3d 72, 78 (1st Cir. 2002) (holding that plaintiff did not allege facts that show strong inference of scienter); Fitzer v. Security Dynamics Technologies, Inc., 119 F.Sup.2d 12, 18 (D.Mass. 2000) (Private Securities Litigation Reform *347 Act makes pleading requirement in securities fraud cases more rigorous than Rule 9(b) traditionally requires). Under the combination of Fed.R.Civ.P. 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. §78u-4(b), the federal courts require the plaintiff in a securities fraud case to plead not only the time, place and content of the allegedly fraudulent statements and the identity of the speaker, but also specific facts which demonstrate why the statements were misleading. Furthermore, the federal courts also require particularity with respect to scienter because §78u-4(b)(2) provides that in order to allege scienter, the complaint must “state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." The purpose of such heightened pleading requirements is to place the defendant on notice of the claims against him; to safeguard defendants from unwarranted damage to their reputations; and to safeguard defendants from the danger of strike suits: those in which plaintiffs bring largely meriüess claims in order to obtain extensive discovery which increases the settlement value of the case. Fitzer v. Security Dynamics Technologies, Inc., 119 F. Sup.2d at 17-18.
There is no merit to Aspen’s contention that the complaint fails to allege sufficient transactional specificity to satisfy Rule 9(b). This is not a fraud on the market case under § 10(b) of the 1934 Securities Exchange Act; rather, F eldman alleges violation of the Act and common-law fraud based on a direct transaction between him and Aspen. The complaint is clear that the fraudulent representations were made to Feldman in connection with the sale of Houston Consulting in exchange for Aspen stock. Moreover, the allegation that Aspen knowingly overstated its revenue by improperly accounting for license transactions by recording them on a sell-in or up-front basis rather than a sell-through or consignment basis is specific enough to comply with Rule 9(b). Cf. In re Peritus Software Services, Inc., 52 F.Sup.2d 211, 222-23 (D.Mass. 1999). There can be no question that the defendants have been adequately warned concerning the particular statements which constitute the alleged fraud so that they can prepare their defense. Friedman v. Jablonski, 371 Mass. at 488-89.
Aspen’s contention that the complaint fails to allege the defendants’ knowledge and intent with sufficient specificity is without merit. In contrast to a claim under §10(b), no scienter is required under G.L.c. 110A, §410(a)(2). Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. at 53. As for the remaining fraud claims, there is no requirement in Massachusetts law that the complaint show a “strong inference of scienter.” Indeed, Rule 9(b), in sharp contrast to the Private Securities Litigation Reform Act, explicitly provides in the second sentence that “(mjalice, intent, knowledge, and other condition of mind of a person may be averred generally.” The second sentence thus qualifies the requirement of particularity for fraud cases contained in the first sentence, permitting a general statement of scienter to suffice. James W. Smith & Hiller B. Zobel, Rules Practice §9.6, at 169 (2006).
In any event, the complaint does contain sufficient facts, which when considered together, support an inference of scienter. It alleges that Aspen’s Audit Committee commenced an investigation into Aspen’s accounting for certain software license and service agreements during fiscal years 1999-2004, Aspen admitted to improper accounting of license revenue during those years, Aspen restated its financial statements for fiscal years 2000 through 2004, and the SEC notified Aspen and its chief executives of possible civil enforcement proceedings arising out of the original financial statements. The complaint also alleges that at the time Aspen made representations to Feldman concerning the truth and accuracy of the Aspen Reports in order to induce him to accept stock, not cash, for the sale of Houston Consulting, and that Aspen knew of the systemic improper accounting practices and the overstatement of license, service, and maintenance revenues. Specifically, Aspen knew but did not disclose that its sales to resellers from 1999-2002 were subject to rights of return and price concessions. Despite this knowledge, Aspen recorded revenues from such sales prior to the expiration of the right of return or determination of a fixed price, resulting in a material overstatement of revenues. Although by no means conclusive, significant violations of GAAP and “accounting shenanigans” are probative of fraudulent intent. Aldridge v. A.T. Cross, Inc., 284 F.3d at 83. When a company is forced to restate its previously issued financial statements, the mere fact that the company had to make a large correction may be some evidence that the defendants knew of the falsity of the prior statements. See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F.Sup.2d 474, 488-89 (S.D.N.Y. 2004) (noting that large adjustment suggests systemic accounting abuses resulting in a misrepresentation of the company’s financial condition, rather than mere error caused by the improper application of technical accounting rules); In re Enron Corp. Securities, Derivative and ERISA Litig., 258 F.Sup.2d 576, 625 n. 55 (S.D.Tex. 2003) (holding that allegation that company was forced to significantly restate its earnings together with the relative seriousness of the restatement support the conclusion that the defendant acted with scienter).
Feldman’s fraud claims are alleged with sufficient particularity both to enable Aspen to prepare its defense and to assure the court that this is not a mere “strike suit.”[4] Accordingly, there is no basis for dismissal under Mass.R.Civ.P. 9(b).
III. Dismissal under Rule 12(b)(1)
Finally, the defendants contend that this Court lacks subject matter jurisdiction because Feldman cannot prove any damages as a result of Aspen’s alleged fraud. The Superior Court has jurisdiction over civil actions for money damages, but a case “may proceed in the court only if there is no reasonable likelihood that recovery by *348 the plaintiff will be less than or equal to $25,000 . . .” G.L.c. 212, §3. The defendants contend that Feldman could not have suffered any damage as a result of misstatements concerning Aspen’s financial condition because he was “in and out” of the stock before the alleged fraud could impact the market. Feldman sold his Aspen shares in 2002, but news of the reality of Aspen’s financial condition did not begin to leak out until October 2004, when the Audit Committee review began, and Aspen did not actually restate its financial reports until March of 2005. Thus, the defendants argue that any loss in the value of Aspen’s stock cannot be attributed to their fraud, and their alleged misrepresentations did not cause Feldman to incur any damage.
Foremost, G.L.c. 110A, §410(a) (2) renders a tainted transaction voidable regardless of the actual cause of the investor’s loss. Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. at 51 & n.16.
With respect to the remaining claims, the theoiy of dismissal advanced by the defendant is one of “loss causation” that originated in the Federal securities fraud context and requires a plaintiff to prove that any post-transaction decline in the value of shares was actually caused by the defendant’s fraud. Reisman v. KPMG Peat Marwick LLP, 57 Mass.App.Ct. 100, 111, 116, rev. den., 439 Mass. 1105 (2003). However, the Appeals Court has rejected the argument that loss causation is necessary to recover damages in a common-law fraud action based on the purchase of securities, stating: “(w]e discern no support in our cases for the loss causation element that [defendant] espouses, nor do we think this troubled concept a desirable addition to our jurisprudence.” Id. at 119. In Reisman, the plaintiffs accepted stock in exchange for the sale of their family business in reliance on the company’s fraudulent financial statements. Id. at 103-08. After the transaction was completed, the value of the stock plummeted and the buyer eventually restated its financial reports for the relevant period. Id. The defendant argued that the plaintiffs:
cannot establish loss causation because, notwithstanding the [plaintiffs’] reliance upon [defendant’s] fraudulent misrepresentations at the time of the transaction, they cannot prove such misrepresentation caused the price of Marcam stock to decline after the transaction, since those misrepresentations were plainly not made public until well after the [plaintiffs] sold their Marcam stock.
Id. at 117. The Appeals Court rejected this argument, stating: “the [plaintiffs] are not required under Massachusetts law (nor would they be under the Restatement [Second] of Torts) to establish this as an element of their fraud claim.” Id. at 117. The fact that a false representation is not revealed until after stock shares are sold does not defeat the right of recovery of the person deceived, and a plaintiff who has sold his shares in the interim may recover damages measured by the difference between the price paid and that received. Id. at 116. Here, Feldman alleges that he gave up his demand for cash consideration and, because of the fraudulent misrepresentations, paid $8 million (the value of his company) for the Aspen shares that were not in fact worth $8 million because they were overvalued, and sold them for only $3 million, a loss of $5 million. The difference between the price paid in June of 2001 and the value of what was actually received in June of 2001 constitutes a compensable loss. Id. at 114, 116. Whether Feldman can establish damages is a factual issue for resolution at a later time, but the allegation clearly meets the jurisdictional requirements of G.L.c. 212, §3. Accordingly, the defendants are not entitled to dismissal based on lack of subject matter jurisdiction.
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendants’ motion to dismiss the complaint be DENIED.

In deciding a Rule 12(b)(6) motion, the court considers only the allegations of the complaint and any exhibits attached to it, and it may also consider matters of public record and orders and items appearing in the record of the case. Schaer v. Brandeis Univ., 432 Mass. 474, 477 (2000). The Agreement was not attached to the complaint but rather was submitted by the defendants in connection with their motion to dismiss. Where the defendant attaches a written instrument to its motion to dismiss, consideration of that document does not convert the motion to one for summary judgment as long as the plaintiff had notice of the document and relied on it in framing the complaint. Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 45 n.4 (2004). Because Feldman references and relies on the Agreement in his complaint, this Court may consider it.

To the extent that the facts bearing on whether there was a vote are not in dispute, summary judgment may be the appropriate vehicle to resolve the legal question as to whether a vote by a single shareholder is a “class vote by stockholders” within the meaning of the Act and whether the defendant has met its burden of proving that the exemption applies.

Although not set forth in the pleadings, Aspen admits in its brief that a securities fraud class action was filed against Aspen in federal court based on its financial statements and the restatements, and Aspen settled the class action in March of 2006. See In re Aspen Tech., Inc. Sec. Litig., No. 1:04-12375-JLT (D.Mass.) (Tauro, J.). Evidence of an ancillary fraud lawsuit that was quickly settled is relevant to scienter. Geffon v. Micrion Corp., 249 F.3d 29, 36 (1st Cir. 2001). Feldman has also brought to this Court’s attention the complaint in a federal action brought by the SEC against three former senior Aspen executives for violations of the Federal Securities Act of 1933. That complaint alleges that Aspen executives engaged in a pattern of fraudulent conduct including the backdating of contracts so that revenue could be prematurely recognized to meet quarterly expectations, entering into side agreements with customers in order to improperly recognize revenue, and issuing knowingly false press releases discussing certain transactions. The SEC complaint further alleges that these fraudulent practices artificially inflated the price of Aspen stock, which Aspen then used to acquire six different companies, including Houston Consulting. This Court does not rely on the contents of the SEC complaint in reaching its decision on the pending motion.