Garsh, E. Susan, J.
This case arises from a theft claim made in 1976 under a homeowner’s insurance policy issued by Northern Assurance Company (“Northern”) to Helen Thompson (“Thompson”). Thompson, who is deceased, sought recovery under her policy for a number of stolen items, including a painting that resurfaced over three decades later. William Apthorp (“Apthorp”), the plaintiff and executor of Thompson’s will, seeks a declaratory judgment that, in his capacity as executor, he is entitled to possession and ownership of the painting upon reimbursing the defendant, OneBeacon Insurance Group, LLC (“One-Beacon”) , who is the successor in interest to Northern, for the insurer’s payment. OneBeacon counterclaimed for declaratory judgment and brought a third-party complaint against Thompson’s heirs. It seeks a declaration that OneBeacon is entitled to all right, title, and interest in the painting.[3] The case is before the court on cross motions for summary judgment. For the reasons discussed below, the plaintiffs and third-party defendants’ motions are allowed, and the defendant’s cross motion is denied.
BACKGROUND
The following facts are undisputed.
Northern issued a policy to Thompson on May 1, 1975, in effect from May 1, 1975 through May 1, 1978. The policy covered a dwelling owned by Thompson at 244 Fairhaven Hill Road in Concord, Massachusetts. The policy had a provision for unscheduled personal property loss, including burglary and theft, up to $32,500.
On November 16,1976, Thompson’s Concord home was burglarized. Among the several items stolen was a portrait painted in 1765 by Angelica Kauffman (the “Painting”). The subject of the Painting was John Apthorp and his two daughters, who were ancestors of Thompson and her heirs. The Painting was regarded as a family heirloom. Thompson reported the theft to the police.
Four days before the burglary, a Boston art dealer provided Thompson with a written appraisal of the Painting. It was appraised at $25,000.
Thompson notified Northern of the burglary. In response, she received a Proof of Loss form. The form is entitled “Claim and Affidavit-Burglary-Robbery-Theft.” Despite the characterization of the form as an “affidavit,” it does not require either a written declaration made under oath or a written statement sworn to be true before someone legally authorized to administer an oath. Thompson was required to certify that the information being provided to the insurer was correct, which she did. She provided the insurer with a schedule of articles stolen, which included thirty-eight items, including cash in the amount of $20. The Painting is among the items listed as having been stolen. Thompson provided an estimated value for only twelve of the items. The estimated value she placed upon those items totaled $65,000. The Painting is the only item whose estimated value is supported by an appraisal. Thompson did not provide an estimated value for a Chinese porcelain umbrella stand, a silver service, numerous other silver items, cultured pearls, and two gold pins. The insurer did not require that any estimated values be provided. The claim form indicates that, upon receipt of the completed form, an adjuster would contact the insured “to take up the adjustment.”
There is no evidence as to whether an adjuster did, in fact, contact Thompson “to take up the adjustment” and no evidence as to the assessment, if any, of the total loss suffered by Thompson that may have been made by the insurer. There is no evidence that Northern contested or accepted any of the estimates placed upon specific stolen items by Thompson. Northern did accept that the value of the stolen unscheduled personal property was no less than $32,500.
On January 19, 1977, Thompson executed a Sworn Statement in Proof of Loss and Subrogation Agreement (“Sworn Statement in Proof of Loss”) under the penalties of perjury. The document was drafted by Northern and primarily contains pre-printed language. Before paying Thompson, Northern required her to sign that agreement. In the Sworn Statement in Proof of Loss, Thompson claimed of Northern and agreed to accept from Northern “in full release and satisfaction in compromise settlement of all claims under this policy” the sum of $32,500. She also acknowledged that the total insurance covering the properly lost in the bur-glaiy was, at the time of the loss, $32,500. The pre-printed language on the document includes the following:
In consideration of the payment to be made hereunder, the assured does hereby subrogate to said insurer all right, title and interest in and to the property for which claim is being made hereunder, and agrees to immediately notify said insurer in case of any recovery of the property for which claim is being made hereunder, and will render all assistance possible in any endeavor to recover said property. Assured also agrees to turn over to said insurer, any such recovery which may be made, or reimburse said insurer in full to the extent of the payment for such property which may be recovered.
In March of 2007, the Painting was recovered after a dealer consulted the Art Loss Register. The Art Loss Register contacted the Concord Police Department, which held the Painting as evidence.
As of September 21, 2007, the Painting had a minimum market value of $400,000 with the possibility that, at auction, it could have a value of as much as $800,000.
*286 DISCUSSION
The interpretation of a contract is a question of law for the court. See Sarvis v. Cooper, 40 Mass.App.Ct. 471, 475 (1996). A contract is to be construed in such a way as to give reasonable effect to each of its provisions. Id. The object is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background, and purpose. USM Corp. v. Arthur D. Little Systems, Inc., 28 MassApp.Ct. 108, 116 (1989).
“The interpretation of an insurance contract is no different from the interpretation of any other contract . . .” Hakim v. Massachusetts Insurers’ Insolvency Fund, 424 Mass. 275, 280 (1997). The starting point must be the actual words chosen by the parties to express their agreement. These words must be construed in their “usual and ordinary sense.” Id. See also General Convention of the New Jerusalem in the U.S.A., Inc. v. MacKenzie, 449 Mass. 832, 835 (2007) (“When the words of a contract are clear, they must be construed in their usual and ordinary sense”).
In the first sentence of the paragraph at issue, the insured “subrogate[d] all right, title and interest” in the Painting to Northern in consideration of the insurer making a payment to her under the policy. In contending that, by virtue of this agreement, Thompson transferred all title to the stolen property to the insurer and retained no rights whatsoever, OneBeacon erroneously equates “subrogate” with “assign.”[4] “Subrogation means substitution, not assignment or transfer.” Reconstruction Finance Corporation v. Teter, 117 F.2d 716, 729 (7th Cir. 1941). Conflating “subrogation” and “assignment” as if these words are interchangeable is inconsistent with the usual and ordinaiy meaning of the term “subrogate.” “The general rule is well established that upon the payment of a loss the insurer is entitled to be subrogated pro tanto to any right of action which the insured may have against a third person whose negligence or wrong caused the loss.” New England Gas & Elec. Ass’n v. Ocean Accident & Guarantee Co., 330 Mass. 640, 659 (1953). The Latin phrase “pro tanto” means “to that extent.” Black’s Law Dictionary 1238 (7th ed. 1999). Subrogation refers to an insurer’s succession to any right of action that the insured may have against the party or parties responsible for the loss after the insurer has paid an insured’s claim. Liberty Mutual Insurance Co. v. National Consolidated Warehouses, Inc., 34 Mass.App.Ct. 293, 296 (1993).[5] In agreeing to subrogate, Thompson agreed that Northern could stand in her shoes for the purpose of pursuing a third party responsible for the loss. See also Black’s Law Dictionary 1440 (7th ed. 1999) (subrogation defined as “. . . (2) [t]he principle under which an insurer that has paid a loss under an insurance policy is entitled to all the rights and remedies belonging to the insured against a third party with respect to any loss covered by the policy”); Lee R. Rugg, Couch On Insurance §222.2, at 222-14 (3d ed. 2000) (subrogation refers to “attempts by insurers to recover from a third party (any entity other than the one which received the proceeds), on the grounds that the entity which did receive the proceeds had right to recover from that third party for the same loss as was compensated by the payment of the policy proceeds”).
Although parties are free to modify subrogation rights by contract, nothing in the agreement or the record suggests that the parties intended the word “subrogate” to have a peculiar meaning that would serve to transfer title in a context other than in connection with a suit against the actual wrongdoer. Were an agreement to “subrogate all right, title, and interest” to be construed as an agreement to assign and transfer for all purposes all title and ownership, the result would be inconsistent with the agreement’s language and purpose. An insurer’s premiums are obviously correlated to the policy limits. In order to pay a lower premium, an insured may choose to purchase less insurance than the value of his personal property. Alternatively, an insured may purchase a policy whose limits match the value of his personal property but choose not to increase the premiums by increasing the policy limit whenever the property appreciates in value. The insured bears the risk of the loss when the value of insured property exceeds the policy limits. It would be unreasonable and produce a windfall to the insurer if, in addition to bearing the risk of loss in excess of the policy limits, an insured, by agreeing to subrogate all right, title and interest, would also be deemed to have assigned for all purposes all title to the stolen property to the insurer.
The plain meaning of the words leads to the conclusion that Thompson’s agreement to “subrogate” does not control the instant dispute. The same sentence in which Thompson agreed to subrogate contains an agreement that the insured “will render all assistance possible in any endeavor to recover said property.” The next sentence controls what happens if, as here, any property is recovered. In the event of recovery, the insured “agrees to turn over to [Northern] any such recovery which may be made, or reimburse said insurer in full to the extent of the payment for such property which may be recovered.”
The agreement is clear that, should property be recovered, the insured must do one of two things: turn over the recovered stolen property to the insurer or reimburse the insurer what the insurer paid to the insured as result of the loss of that property. The word “or,” which clearly and unambiguously separates the obligation to turn over recovered property from the obligation to reimburse, must be construed in its ordinaiy disjunctive sense. See Shabshelowitz v. Fall River Gas Co., 412 Mass. 259, 263-64 (1992). The *287 performance of either one of the alternatives unambiguously fulfills the insured’s obligation under the contract.
A contract is ambiguous only if the language at issue is susceptible of more than one meaning and reasonably intelligent persons would differ as to which of two or more meanings is the proper one. Citation Insurance Co. v. Gomez, 426 Mass. 379, 381 (1998). An ambiguity is not created simply because a controversy exists between the parties over the proper interpretation. Lumbermens Mutual Casualty Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995). The plain language does not support OneBeacon’s argument that the insured, in effect, agreed to “turn over to said insurer, any such recovery which may be made, or reimburse said insurer in full to the extent of the payment for such property which may be recovered, whichever option is selected by the insurer.” Once again, the insurer’s construction of the agreement would result in a windfall to the insurer. OneBeacon’s reading of the agreement would mean, for example, that in a situation in which property insured for $10,000 is worth $100,000 at the time of the loss, the insurer would be entitled to demand that the recovered $100,000 item be turned over to it even though the insurer paid only $10,000 for the loss. If the parties had intended to allocate to the insurer the right to dictate whether the insurer would receive the recovered item or the money it paid out under the policy, the word “or” undoubtedly would not have been left unqualified
Even if the language at issue may be seen as ambiguous, the result would be the same because the court would construe the wording against the insurer. Neither party has proffered any parol evidence. The language at issue was drafted by the insurer. “It is settled that a written instrument is construed strongly against the party who drew it if ambiguous or uncertain language is used.” Bowser v. Chalifour, 334 Mass. 348, 352 (1956). See Leblanc v. Friedman, 438 Mass. 592, 599 n.6 (2003) (citing Bowser in construing a release agreement against the drafter).
The remaining issue concerns the amount that the insurer must be reimbursed. The resolution of this issue depends on the “extent of the payment” that Thompson received from Northern for the Painting.
The heirs argue that because Thompson’s loss amounted to $65,000 and the insurer paid $32,500, the insurer paid fifty percent of each item stolen. They maintain, therefore, that OneBeacon is entitled only to $12,500, one-half of the estimated value of the painting. In so calculating the “extent of the payment” made by the insurer, the heirs ignore that the schedule of items sent to the adjuster had numerous items with no estimated values, making the insured’s loss greater than $65,000 if her estimates were accepted. The aggregate loss may actually have been less or more than $65,000. The Painting was the only item whose value was backed up with a recent appraisal; the other items may have been less than the estimate put upon them by the owner, with several items having no estimated value. There also is no evidence that the insurer accepted each of the estimates. The Sworn Statement in Proof of Loss contains a claim only for $32,500. Nowhere in the Sworn Statement in Proof of Loss does the $65,000 figure appear. Neither the insurer nor the insured were required, under these circumstances, to come to an agreement as to the extent of the loss because the insurer accepted that the loss was in excess of the policy limit of $32,500. There is no Credible evidence that the insurer paid fifty percent of the Painting’s value to Thompson. It would be speculative to assign a dollar value to each one of the items stolen that make up the $32,500 claim. Without making such an assignment, however, an accurate percentage of the insurer’s payment attributable to the Painting cannot be fixed. On the facts of this case — where the Sworn Statement contains a claim for $32,500; the Painting had an appraised value of $25,000; and neither side has tendered any evidence as to what value, if any, the insured and insurer agreed upon with respect to each item lost— the “extent of the payment” made by the insurer for the Painting is deemed to be $25,000, the full value of the Painting at the time of its loss.
There is no support for OneBeacon’s final argument that any reimbursement of the amount paid by Northern should be paid to it with annual compound interest at the rate of ten percent per annum from the date of the payment. The agreement requires the insured to repay only the amount it received. It does not require that the repayment be with interest. OneB-eacon is not entitled unilaterally to rewrite the agreement that the insurer drafted to add a requirement that interest be paid to the insurer from the date of its payment for the loss.[6]
ORDER
It is hereby ORDERED that the Motions of Plaintiff and Third-Party Defendants for Summary Judgment be and hereby are ALLOWED and that the Defendant’s and Third-Party Plaintiffs Motion for Summary Judgment be and hereby is DENIED. The Court further DECLARES that William O. Apthorp, Executor of the Will of Helen S. Thompson, is entitled, in his capacity as executor, to possession and full ownership of the 1765 portrait of John Apthorp and his two daughters painted by Angelica Kauffman in 1765 upon reimbursement of the sum of $25,000.00 to OneBeacon Insurance Group, LLC.

The third-party defendants have not counterclaimed. They do not seek a judgment that they are entitled to the painting at issue rather than the executor.

OneBeacon’s citations to J.A. Appleman, Insurance Law and Practice do not support the position it takes in this case. For example, section 4053 is cited in support of the proposition that “[w]here an insured has assigned and transferred each and all . . . claims and demands, an insured does not retain any part of the claim or demand.” In addition to ignoring that the agreement at issue does not use the word ‘assign," OneBeacon ignores the actual language of section 4053, which states: “Upon settling a loss, the insurer may take an assignment of the insured’s right of action against the person who caused the loss, thereby subrogating itself to such right.” 6A J.A. Appelman, Insurance Law and Practice §4053, at 134 (1972 and 2008 Supp.). This section most definitely does not state that an agreement to subrogate is tantamount to an assignment. Indeed, it goes on to point out that “there is a difference between a subrogation and an assignment.” Id. at 135. OneBeacon misleadingly cites section 8861 by purporting to quote from that section, but it has eliminated material language from its quotation without including any punctuation marks that would advise the court that language has been omitted. The quoted portion of the sentence in fact states: “When a claim is paid by an insurer under a theft policy the insurer takes an assignment of ownership from its insured and, in such context, ownership is equivalent to ‘title’ within meaning of statute providing that there is in a contract for sale a warranty by the seller that the title conveyed shallbe good...” 6A J.A. Appelman, Insurance Law and Practice §8861, at 283 n.26(1981) (emphasis added). OneBeacon chose to omit the italicized words in its Memorandum of Law.

Ervin v. Garner, 267 N.E.2d 769 (Ohio 1971), relied upon by OneBeacon, does not extend the principle of subrogation beyond claims against third parties. The case is therefore not persuasive authority for the proposition that all title to the Painting passed to Northern when it paid the claim. In Ervin, the court held that an insured who recovers a money judgment against a tortfeasor must repay the insurer to the extent of the insurance payment he had received in accordance with terms of the subrogation agreement entered into between the parties.

Nothing in Neitlich v. Arnica Mutual Ins. Co., 7 Mass.App.Ct. 661, 664 (1979), requires a different result. Neitlich holds that when a judgment against a third-party tortfeasor is secured by an insurer as subrogee, the insurer is entitled to a proportional share of the pre-judgment interest. Furthermore, in arguing that it is entitled to interest from the time of payment of the loss, OneBeacon once again references a section in J.A. Appleman, Insurance Law and Practice without fully disclosing what said section actually states. Section 4103, the section relied upon by OneBeacon, states in relevant part: “An insurer recovering from a third party wrongdoer has been held to be entitled to interest upon the payment of the loss paid from the time of payment.” 6A J.A. Appleman, Insurance Law and Practice §4103, at 389 (1972 and 2008 Supp.) (emphasis added). Had OneBeacon brought a breach of contract action and proven that it was ready and willing to accept $25,000 as reimbursement and that the plaintiff and third-party defendants demanded both to retain the Painting and refused to reimburse it for the payment made, OneBeacon would have been entitled to statutory interest from the date of breach. The papers submitted by OneBeacon, in connection with its cross motion, however, reflect that OneBeacon was offered the sum of $25,000; there is no evidence of a breach of contract